UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GEORGE LARDNER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 03-0180 (JDB) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## OR, IN THE ALTERNATIVE, FOR A MORE ADEQUATE *VAUGHN* INDEX

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff George Lardner hereby moves for summary judgment on the ground that there is no genuine issue of disputed material fact and that he is entitled to judgment as a matter of law. In the alternative, plaintiff moves for a more adequate *Vaughn* index, insofar as the Department of Justice has not adequately identified the withheld records listed on Tab A of the index.

In support of this motion, plaintiff submits the accompanying (1) memorandum, (2) statement of material facts as to which there is no genuine dispute, (3) declarations of George Lardner and Scott Nelson, and (4) a proposed order. This motion is also based on the *Vaughn* declarations and revised *Vaughn* index filed by defendant Department of Justice.

Respectfully submitted,

_____/s/_____
Allison M. Zieve (DC Bar No. 424786)
Scott L. Nelson (DC Bar No. 413548)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
202-588-1000

July 29, 2004

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GEORGE LARDNER,                                )
                                               )
                    Plaintiff,                 )        Civil Action No. 03-0180 (JDB)
                                               )
v.                                             )
                                               )
UNITED STATES DEPARTMENT                       )
OF JUSTICE,                                    )
                                               )
                    Defendant.                 )

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, FOR A MORE ADEQUATE *VAUGHN* INDEX**

**INTRODUCTION**

This Freedom of Information Act ("FOIA") case involves records of the Office of the Pardon

Attorney concerning clemency applications that are, with only a handful of exceptions, 15 to 31

years old.   Invoking FOIA exemption 5, the Department has claimed the presidential

communications privilege and the deliberative process privilege for thousands of records.  Although

the presidential communications privilege is based on the need to protect the confidentiality of

communications with the President and thus to encourage candor in the advice provided to him, the

Department has reached so far as to claim that privilege for documents that were neither sent to the

White House nor provided any advice to anyone.  The Department has also asserted the presidential

communications privilege and, in some cases, the deliberative process privilege, for many records

that are publicly available in full from other sources.

Beyond these obvious instances of overreaching, the Department's broad exemption 5 claims

fail for two fundamental reasons.  First, the presidential communications privilege has not been

invoked by anyone with the authority to do so.  The Department's *Vaughn* declarations and index

show that the President has neither invoked the presidential communications privilege nor directed anyone to assert the privilege on his behalf.  For this reason, the presidential communications privilege cannot be used to shield the requested records from the public.  Second, with few exceptions, the records for which the Department claims an exemption 5 privilege are more than 14 years old.  Because both the presidential communications privilege and the deliberative process privilege erode over time, exemption 5 no longer applies to the vast majority of the records.

In addition, the Department has asserted various exemptions for some records that it has not asserted for other, very similar records.  Because it has not distinguished between the material for which it has asserted the exemptions and the similar material for which it has not, the Department has failed to carry its burden of showing that the exemptions apply.

Furthermore, the Department has invoked exemption 6 to justify numerous redactions.  Many of these redactions are not necessary to protect against unwarranted invasions of privacy.

Finally, assuming that the presidential communications privilege applies to the letters of advice, the Department's *Vaughn* index is inadequate, and should be supplemented, because the Department has failed to identify the name of the clemency applicant discussed in each letter.

## BACKGROUND

**STATEMENT OF THE CASE**

Plaintiff George Lardner is a *Washington Post* reporter and is writing a book on use of the presidential pardon power. In preparing his book, Mr. Lardner is examining historical records concerning pardons and other clemency actions.  Some of these records are held by the Office of the Pardon Attorney, a component of the Department of Justice.  The records at issue concern clemency applications from 1960 to 1989.  In his experience, based on his review of similar records, the files

from the Office of the Pardon Attorney form the best collection of materials explaining the considerations that have been decisive in the determination of whether to grant or deny a pardon. Thus, understanding the Department's role in the clemency process and, more broadly, how the clemency process has functioned historically requires access to these materials.

The records that Mr. Lardner requested fall into two categories.  First, he seeks any "letters of advice" concerning pardons from 1960 to 1989 that are still in the custody of the Office of the Pardon Attorney because they have not been transferred to the National Archives with other historical records.  *See* Complaint ¶¶ 10-13.  "Letter of advice" is the Pardon Attorney's name for a report on a pardon or clemency request prepared by the Department.  This report includes a recommendation of the Attorney General (or his designee) to the President.  *See* Love, *Of Pardons, Politics and Collar Buttons: Reflections on the President's Duty To Be Merciful*, 27 Fordham Urb. L.J. 1483, 1490 & n.27 (2000).  Initially, the Department claimed that all letters of advice from 1960 to 1989 are exempt from disclosure under FOIA.  Complaint ¶ 14.

Second, Mr. Lardner requested the complete files on the clemency applications of 25 well-known individuals (*e.g.*, Marcus Garvey, John Ehrlichman, and Jimmy Hoffa) who either received a pardon or commutation or submitted an unsuccessful petition for pardon or commutation before January 20, 1989.  *Id.* ¶¶ 17-39.  The Office of the Pardon Attorney withheld some of these records in their entirety and released others with redactions.  *Id.* ¶¶ 31-37, 39.  That Office also referred some records to the Office of Legal Counsel or the FBI for review and potential release.  Both of those offices later released some records, although the FBI redacted many.  *See* Keeley Decl. ¶¶ 7-8 & Table (p. 5).

3

After Mr. Lardner filed this lawsuit, the Department abandoned its claim that records dated prior to December 31, 1972 are privileged.  The Department then transferred the records dated prior to that date to the National Archives to be processed and made available to Mr. Lardner in accordance with FOIA.  *See* Morison Decl. ¶¶ 17-18.  In addition, the Department acknowledged that some of the letters of advice that it had withheld as privileged presidential communications had already been made public by the Presidential Libraries holding records from the Ford and Carter Administrations, and the Department released its copies of those documents.  *Id*. ¶ 19.  Now, with respect to the presidential communications privilege, the records that remain at issue are letters of advice dated between January 1973 and January 1989, and other records concerning applications for pardon and clemency considered in the Nixon, Ford, Carter, and Reagan Administrations.[1]

The Department initially filed a *Vaughn* index and motion for summary judgment on June 20, 2003.  Because the *Vaughn* index bundled large numbers of records together and did not provide dates for the withheld documents, Mr. Lardner moved to compel the Department to provide an adequate *Vaughn* index.  His motion also challenged the *Vaughn* declarations, which failed to state the steps that the Department had taken to ascertain whether the individuals as to whom information was redacted on privacy grounds were still alive.  The Department opposed the motion, but also provided a supplemental declaration to address the privacy issue.  In ruling on Mr. Lardner's motion, the Court denied the Department's summary judgment motion without prejudice and ordered the Department to supply a new *Vaughn* index with dates and the basis for alternative exemption claims.

---

[1]The only exceptions are five of the 236 records from the "individual case files" listed on the *Vaughn* index that are dated in late 1989 and early 1990, and seven that are dated in 2000 or 2001.

In the Third Morison Declaration, the Department identifies three categories of records withheld on the basis of the presidential communications privilege: (1) letters of advice to the President, (2) other records reflecting communications between the Department and the Office of Counsel to the President, and (3) other communications authored or solicited by the Pardon Attorney and his staff relating to or made in the course of preparing advice to the President. Third Morison Decl. ¶ 1. For example, the Department is asserting this privilege for "a cover memorandum forwarding a clemency warrant for the President's review," Index #191; *see also* Index ## 111, 112, 113, 116, and for cover memos that were never even sent to the White House. *See*, *e.g.*, ## 195 (cover memo from Deputy Attorney General to Office of the Pardon Attorney), 118). In addition, the Department has claimed the presidential communications privilege for letters and memos sent by the Pardon Attorney to solicit recommendations from judges, probation officers, and others. *See*, *e.g.*, Index ## 13, 30, 32, 35, 44, 45, 82, 83, 107, 128, 130, 132, 199, 200, 206, 225, 227; *see also*, *e.g.*, Index #34 (letter from U.S. Attorney to acting Pardon Attorney reporting on status of response to request for recommendation). The descriptions on the *Vaughn* index indicate that these records contain no advice to anyone, much less the President.

The Department also claimed that various documents are exempt in whole or in part under FOIA's deliberative process privilege and under the privacy privileges of exemptions 6 and 7(C).

In May 2004, the National Archives and Records Administration ("Archives"), which has custody of the Nixon presidential papers, made some 1973 pardon documents publicly available. *See* www.archives.gov/media_desk/press_releases/nr04-60.html. These documents include all letters of advice from 1973. Lardner Decl. ¶ 2 & Exh. 1. Nonetheless, in this case, the Department

continues to assert the presidential communications privilege to withhold those same publicly available letters. *See* Index, Tab A (listing more than 370 letters from 1973).

In May 2004, Mr. Lardner traveled to the Ford Library in Michigan to look at pardon documents. Lardner Decl. ¶ 8. In anticipation of Mr. Lardner's visit, the Ford Library had opened all of its pardon records, which it made available to Mr. Lardner subject only to redactions to protect individuals' privacy. *Id*. ¶¶ 8-9 & Exh. 4. Accordingly, Mr. Lardner was able to peruse and copy many documents, in particular letters of advice from 1974-1976. *Id*. ¶ 9 & Exhs. 4, 5.[2] The Department claims the presidential communications privilege for copies of those same documents.

On June 18, 2004, following a stay in this case pending a decision in *Judicial Watch v. Department of Justice* (described below) and based on the parties' stipulation, the Department produced a new *Vaughn* index. Tab A to the index shows that the Department is withholding more than 550 letters of advice from the Nixon Administration (January 1973 - August 1974), more than 650 letters from the Ford Administration (August 1974 - January 1977), more than 1,000 each from the Carter Administration (January 1977- January 1981), and even more from the Reagan Administration (January 1981-January 1989). In addition, more than 90 of the 236 entries on the Department's more detailed *Vaughn* index describing records withheld from the "individual case files" are at least 25 years old. More than 120 are at least 20 years old. All but nine of the 236 entries (all from the Harrison Williams files) are more than 14 years old, and all but 14 (from the Harrison Williams and John Ehrlichman files) are more than 15 years old. Every one of the withheld

---

[2]The Ford Library has since told Mr. Lardner that the National Archives asked it not to release pardon documents because of pending litigation. Lardner Decl. ¶ 10.

records concerning David Beck, Iva d'Aquino ("Tokyo Rose"), Marcus Garvey, Jimmy Hoffa, Otto

Kerner (except for one memorandum), Richard Nixon, and Frank Sturgis is more than 25 years old.

**THE *JUDICIAL WATCH* DECISION**

On May 7, 2004, the D.C. Circuit issued its decision in *Judicial Watch v. Department of*

*Justice*, 365 F.3d 1108 (2004). That case arose from Judicial Watch's FOIA request for records that

related to pardon grants and applications considered by President Clinton. *Id.* at 1110 n.2. In

response to the request, the Department released some documents but, as in this case, withheld many

others under the presidential communications privilege, the deliberative process privilege, or the

privacy privilege. Records withheld under the presidential privilege included (1) letters and reports

from the Deputy Attorney General to the President, (2) communications between the Department

and the White House Counsel's Office concerning pardon applications and between the White

House Counsel's Office and the President discussing the Department's recommendations, (3)

proposed recommendations for the Deputy Attorney General's consideration, authored by the

Pardon Attorney or the Attorney General's staff, (4) internal communications and working

documents from the Deputy's staff to the Pardon Attorney, and (5) other communications received

from other agencies in the course of preparing pardon recommendations for the President. *Id.* at

1110-11. The district court held that all of these records were properly withheld under the

presidential communications privilege.

On appeal, Judicial Watch argued that the presidential privilege covered only those

documents "solicited and received" by the Office of the President. The D.C. Circuit agreed, holding

that "internal agency documents that are not solicited and received" by the President or his Office

are protected against disclosure, if at all, by the deliberative process privilege. *Id.* at 1112, 1121.

Accordingly, the Court found that only those documents that fell within the first two of the five categories of documents described above were covered by the presidential privilege.

As described above, the Department's original summary judgment motion in this case described three categories of documents purportedly covered by the presidential privilege: letters of advice, other communications between the Department and the White House, and other communications authored or solicited by the Pardon Attorney and his staff.  Under *Judicial Watch*, the first two of these categories are generally eligible for protection by the presidential privilege. However, the D.C. Circuit expressly left open the question, discussed below, whether the privilege could be invoked by the Department, as opposed to the President.  *Id.* at 1114.  In addition, the records at issue in *Judicial Watch* were from President Clinton's Administration, and therefore relatively recent.  Accordingly, Judicial Watch did not argue that any otherwise applicable privilege had eroded over time.

## ARGUMENT

## I.     EXEMPTION 5 DOES NOT JUSTIFY THE WITHHOLDINGS IN THIS CASE.

FOIA exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 protects agency records that "fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

Among the privileges available to the government are "the deliberative process privilege" and the "presidential communications privileges," both of which are subcategories of executive

privilege.  *See Association for Women in Science v. Califano*, 566 F.2d 339, 343 (D.C. Cir. 1977).

Both privileges protect the government's interest in encouraging officials to give candid advice,

uninhibited by fear of premature disclosure.  *See United States v. Nixon*, 418 U.S. 683, 708 (1974);

*Judicial Watch*, 365 F.3d at 1113-14; *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d

854, 866 (D.C. Cir. 1980).  The deliberative process privilege is a common-law development with

roots in decisions issued in the 1950s.  *See Kaiser Aluminum & Chemical Corp. v. United States*,

157 F. Supp. 939, 946 (1958).  The presidential communications privilege was recognized as a

distinct constitutionally based privilege in *United States v. Nixon*, 418 U.S. at 705-09.

Under the deliberative process privilege, communications containing factual information that

does not reveal internal deliberations must be released. *EPA v. Mink*, 410 U.S. 73, 87-91 (1973);

*Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 792-94 (D.C. Cir. 1971).  In

addition, the agency must show that the records withheld are both "predecisional" and

"deliberative."  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Petroleum Information Corp.*

*v. Department of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

Although the presidential communications and deliberative process privileges are "closely

affiliated," the D.C. Circuit has held that the presidential privilege "affords greater protection against

disclosure."  *In re Sealed Case*, 121 F.3d at 745-46.  The D.C. Circuit has held that the presidential

communications privilege "applies to documents in their entirety, and covers final and

post-decisional materials as well as pre-deliberative ones."  *In re Sealed Case*, 121 F.3d at 745. [3]  In

---

[3]These distinctions between the deliberative and presidential privileges appear to originate
with *In re Sealed Case* and have not been addressed by the Supreme Court or other Circuits.  While
Mr. Lardner reserves the right to challenge, on appeal, aspects of *In re Sealed Case* and *Judicial
Watch* that may limit access to the materials at issue here, he recognizes that the holdings of these
(continued...)

this respect, the presidential communications privilege may provide broader protection than the deliberative process privilege, yet the circumstances in which it can be invoked are more limited. Whereas the deliberative process privilege "applies to decisionmaking of executive officials generally," the presidential communications privilege applies "specifically to decisionmaking of the President." *Id.* Prior cases have recognized three significant limitations on the ability of the government to invoke the presidential communications privilege.

First, executive privileges must be formally invoked by a senior government official with appropriate authority. In the case of the presidential communications privilege, the case law indicates that only the current President, a former President, or the White House Counsel acting at the direction of the President may invoke the privilege. *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953); *In re Sealed Case*, 121 F.3d at 744-45 n.16.

Second, Presidential advisors in the White House Office have a special constitutional status because of their proximity to the President, and the President has particularly broad authority over the records of advisors who solely advise and assist the President. *See Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1294-95 (D.C. Cir. 1993). The President does not have this same authority over the records of officials in executive agencies because such records are subject to FOIA and the Federal Records Act. *Id.* at 1289-90, 1292-93. In part for this reason, the presidential communications privilege does not extend to agency records not solicited and received

---

[3](...continued)
cases are binding on this Court.

by the President.  *Judicial Watch*, 365 F.3d at 1121; *In re Sealed Case*, 121 F.3d at 753; *Ryan v. Department of Justice*, 617 F.2d 781, 790-91 (D.C. Cir. 1980).[4]

Finally, and of critical importance to this case, the presidential communications privilege is a qualified privilege that erodes over time. *See Nixon v. Administrator of General Servs.*, 433 U.S. 425, 450-51 (1977); *Nixon v. Freeman*, 670 F.2d 346, 356 (D.C. Cir. 1982).  Because the deliberative process privilege is a weaker privilege generally, and because the bases for the two privileges are so similar, *see generally Judicial Watch*, 365 F.3d at 1113-15, the deliberative process privilege also erodes over time.  Thus, over time, the interests that justify these privileges are outweighed by the interest in access to historical materials.  *See also id.* at 1114 (privilege "can be overcome by a showing of sufficient need").

### A.    The Presidential Communications Privilege Applies Only To Records Solicited And Received By The President Or His Immediate Advisors.

As described above, the Department is claiming a presidential communications privilege for three categories of records.  Third Morison Decl. ¶ 1.  The third category includes records that were not received and solicited by the President or his immediate advisors.  *Id.*  Under *Judicial Watch*, the presidential communications privilege does not apply to any of these records.  365 F.3d at 1112, 1121.  Therefore, those records must be released.[5]

---

[4]Prior to *Judicial Watch*, the D.C. Circuit had held that the presidential communications privilege should not extend to records from "staff outside the White House in executive branch agencies." *In re Sealed Case,* 121 F.3d at 752.  Although *Judicial Watch* extended the privilege to pardon records sent from the Department to the White House, and this Court is bound by that decision, Mr. Lardner disagrees with this aspect of *Judicial Watch* and, if necessary, would seek to argue on appeal that the D.C. Circuit should overrule that holding and hold that the first two categories of records in this case do not fall under the presidential communications privilege.

[5]The records in the Department's third category for which the Department claims the
(continued...)

11

**B.** **The Presidential Communications Privilege Does Not Apply Here Because It Has Not Been Invoked By The President Or Any Other Official Qualified To Assert It.**

The Department relies heavily on the presidential communications privilege to justify withholding documents from Mr. Lardner.   However, that privilege provides no basis for withholding in this case because only the President can invoke it, and he has not.  For this reason, the presidential communications privilege does not justify the Department's withholding of *any* records in this case.

The presidential communications privilege is a type of executive privilege.  Like other executive privileges, it cannot be invoked by government counsel.   Rather, invocation of the privilege requires "a formal claim of privilege by the 'head of the department' having control over the requested information."  *Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000); *accord Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 543 (D.C. Cir. 1977).  The formal invocation requirement has been "uniformly applied irrespective of the particular kind of executive claim advanced." *United States v. O'Neill*, 619 F.2d 222, 226 (2d Cir. 1980) (quoting *Carter v. Carlson*, 56 F.R.D. 9, 10 (D.D.C. 1972)); *accord National Lawyers Guild v. Attorney General*, 96 F.R.D. 390, 403 (S.D.N.Y. 1982) (requiring that Attorney General personally assert state secrets privilege).

For instance, in *Kerr v. United States District Court*, 511 F.2d 192, 198 (9th Cir. 1975), *aff'd*, 426 U.S. 394 (1976), the court rejected the government's privilege claim because it was based solely on an objection to discovery requests, without a formal claim of privilege by an appropriate official.

---

[5](...continued)
privilege are represented on the revised *Vaughn* index by entries in unshaded boxes.  Records in the Department's first and second categories as to which the Department claims this privilege appear in shaded boxes.  Third Morison Decl. ¶ 1.

12

Similarly, in *Carter v. Carlson*, the government's claim was rejected because counsel's assertions were not supported by a declaration or testimony from a senior official making a formal claim of privilege.  56 F.R.D. at 10-11; *accord United States v. O'Neill*, 619 F.2d at 225.

The requirement of formal invocation of the presidential communications privilege assures that the President has personally made a judgment that invoking the privilege is in the public interest and that he is personally accountable for that decision.  The Supreme Court has observed that the privilege is properly invoked "[i]f a *President* concludes" that disclosure "would be injurious to the public interest."  *United States v. Nixon*, 418 U.S. at 713 (emphasis added).  Similarly, the D.C. Circuit has observed that where a former President asserts the privilege, "an incumbent President, aided perhaps by his close subordinates, must exercise some discrimination and judgment" to determine "if he wishes to support it."  *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988); *accord Reynolds*, 345 U.S. at 8 n.20 (essential that decision to assert executive privilege "be taken by the minister who is the political head of the department and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced") (quoting *Duncan v. Cammell, Laird & Co.* [1942] A.C. 624, 638); *United States v. AT&T*, 86 F.R.D. 603, 605 (D.D.C. 1979) (decision to invoke executive privilege "involves policy, not simple law" or categorization of documents, "and therefore is more than a Government lawyer's decision," and "should be made by a policy-maker who can be assumed to have the larger public interest in mind").  A President "has the primary, if not the exclusive, responsibility of deciding when presidential privilege must be claimed, when *in his opinion* the need of maintaining confidentiality in communications . . . outweighs whatever public

interest or need may reside in disclosure." *Dellums v. Powell*, 561 F.2d 242, 247-48 (D.C. Cir. 1977) (emphasis added).

History also supports the conclusion that the presidential communications privilege requires evidence that the President has personally considered the matter and "formed the view that on grounds of public interest [the records] ought not to be produced." *Reynolds*, 345 U.S. at 8, n.20 (citation omitted).   In prior cases concerning the presidential communications privilege, the President (or former President) had taken responsibility for the decision to invoke the privilege by personally submitting a formal statement invoking the privilege or specifically directing the White House Counsel formally to invoke it.   *See In re Sealed Case*, 121 F.3d at 744-45 n.16.   In each of five case concerning White House records of the Nixon Administration, Mr. Nixon personally invoked the privilege. *See Nixon v. Administrator*, 433 U.S. at 447-48; *United States v. Nixon*, 418 U.S. at 688; *Dellums v. Powell*, 561 F.2d at 244; *Senate Select Committee v. Nixon*, 498 F.2d 725, 727 (D.C. Cir. 1974); *Nixon v. Sirica*, 487 F.2d 700, 705 (D.C. Cir. 1973); *see also Blumenthal v. Drudge*, 186 F.R.D. 236, 242 (D.D.C. 1999) (President alone may invoke presidential communications privilege, although White House official being deposed may delay responding to question to give President opportunity to assert privilege); *Center on Corporate Responsibility, Inc. v. Shultz*, 368 F. Supp. 863, 873 (D.D.C. 1973) (White House Counsel declaration stating that "White House" is claiming executive privilege is insufficient to constitute formal claim of executive privilege).

Indeed, Presidents recognized the requirement that the President personally approve assertion of the privilege even before the presidential communications privilege was endorsed in *United States v. Nixon*.   In a series of letters dating back to 1962, the Chairman of the House Special Government Information Subcommittee requested that the incumbent President describe the conditions under

14

which officials within their administrations would be permitted to withhold information in the name of executive privilege.  Presidents Kennedy, Johnson, and Nixon all responded that the privilege would not be asserted without specific presidential approval.  *See* Hearing before the Subcommittee on Separation of Powers, Executive Privilege: Withholding of Information by the Executive, 92nd Cong., 1st Sess. 33-37 (1971).  The Department of Justice's Office of Legal Counsel, speaking through then-Assistant Attorney General William H. Rehnquist, also endorsed this requirement in 1971 testimony stating that the privilege belongs exclusively to the President and that agencies do not have authority to withhold information based on executive privilege without the President's approval.  *See id.* at 421, 427, 440-41.

In this case, the Department has submitted no evidence suggesting that the President decided to assert the presidential communications privilege or is even aware of its assertion.  None of the Department's declarations states that the President has invoked the privilege.  Indeed, none even states that the declarant is purporting formally to invoke the privilege.  The declarations from the White House Counsel and the Pardon Attorney describe the Department's role in processing pardon applications, but neither declaration mentions the presidential communications privilege or states that the declarant has even reviewed the records at issue.  *See* Gonzalez Decl.; Adams Decl.  The Deputy Attorney General's declaration indicates only that he concluded, after reviewing a sample of the records, that the documents "are properly subject to the *deliberative process privilege.*" Thompson Decl. ¶ 6 (emphasis added).  And the first declaration of Samuel Morison, an attorney-advisor to the Office of the Pardon Attorney, states that the privilege was invoked for certain records, Morison Decl. ¶¶ 14-16, and that "the *Department* recently *decided*, as a matter of administrative discretion, to no longer assert any Exemption 5 privileges with respect to the records

at issue that are more than thirty years old." *Id.* ¶ 17 (emphasis added).  In this way, the Morison

Declaration makes clear that "the Department," not the President, has chosen the documents for

which the privilege will be claimed.  Because the President has not formally invoked the presidential

communications privilege, the privilege does not apply to any records at issue in this case.

> **C.     With Respect To Records From 1973 To 1989, Both The Presidential
> Communications Privilege And The Deliberative Process Privilege Have
> Eroded Over Time And No Longer Justify Withholding Here.**

Both the presidential communications privilege and the deliberative process privilege are

intended to maintain the confidentiality of Executive Branch communications "to encourage the

candid advice necessary for effective decisionmaking."  *Dellums v. Powell*, 561 F.2d at 246

(addressing presidential communications privilege); *see Dudman Communications Corp. v.

Department of the Air Force*, 815 F.2d 1565, 1568 (1987) (addressing deliberative process

privilege).  Yet "[t]here has never been an expectation that the confidences of the Executive Office

are absolute and unyielding."  *Nixon v. Administrator*, 433 U.S. at 448-49; *id.* (former presidents

from Herbert Hoover on have deposited their papers in presidential libraries for "preservation and

*eventual disclosure*") (emphasis added).  Rather, the "expectation of the confidentiality of executive

communications [] has always been limited and subject to erosion over time after an administration

leaves office."  *Judicial Watch*, 365 F.3d at 1124 (quoting *Nixon v. Administrator*, 433 U.S. at 451)

(brackets in *Judicial Watch*).

In this regard, clemency records are no different from other presidential records, and the

advice that a president receives about clemency applications is no different from the advice that the

president receives in performing his other Article II functions—advice about appointments, foreign

policy, and proposing budgets, for example.  Indeed, by "waiving" any applicable exemption 5

16

privileges for clemency records more than 30 years old (measured from the date of processing of the material), Morison Decl. ¶ 17, the Department has acknowledged that both the presidential communications and deliberative process privileges erode over time for this category of records as for others.  The only real question, then, is the length of time.  Here, because almost all of the records at issue are 15 to 31 years old, neither of the exemption 5 privileges asserted by the Department applies.[6]

"Although there is no fixed number of years that can measure the duration of the privilege," *Nixon v. Freeman*, 670 F.2d at 356, case law, statute, and historical practice indicate that, after about 8 to 12 years, the presidential communications privilege has eroded to the extent that any residual interest in confidentiality is outweighed by the strong public policy in favor of open access to materials of historical interest.  Thus, in *Nixon v. Freeman*, the D.C. Circuit indicated that eight years was sufficient to erode the privilege to the point where a generalized historical interest was sufficient to overcome the privilege as to tapes of non-Watergate-related presidential communications.  *Id.*  Moreover, the court explicitly rejected Nixon's suggestion that access to the materials be restricted for 25 years—five years fewer than the restriction asserted by the Department in this case.  *Id.* at 357-58.

The court in *Freeman* also noted that its decision was consistent with the restrictions on public access to presidential records set forth in the Presidential Records Act ("PRA"), 44 U.S.C. § 2201, *et seq.*, which reflects Congress' view that the presidential communications privilege has

---

[6]This argument applies to all records for which the Department is claiming the presidential communications privilege or the deliberative process privilege, with the exception of seven records in the Harrison Williams file that are dated in 2000 and 2001.  *See* Index ## 222, 223, 231, 232, 233, 234, 235.

considerably weakened within 12 years after a President leaves office.  670 F.2d at 356 n.13.

Enacted in 1978, the PRA establishes public ownership and control of presidential records

(beginning with those of President Reagan) and provides for public access to presidential records

after a President leaves office.  The PRA provides that after a President leaves office, custody and

control over all his presidential records are immediately vested in the Archivist of the United States,

who thereafter is solely responsible for preserving and securing the records and preparing them for

public access.  44 U.S.C. § 2203(f)(1).  Members of the public cannot compel disclosure of

presidential records for the first five years after the Archivist acquires them.  *Id.* § 2204(b)(2)(A).

After five years, the records become subject to FOIA, which the PRA incorporates.  *Id.* § 2204(c)(1).

For up to 12 years, however, an outgoing President may impose a blanket restriction on access to

certain records, such as those containing classified national security information, *id.* § 2204(a)(1);

information relating to appointments to federal office, *id.* § 2204(a)(2); and confidential

communications requesting or submitting advice, between the President and his advisers, or between

such advisers, *id.* § 2204(a)(5).  Then, after 12 years, formerly restricted materials become available

to the public through FOIA to the same extent as materials that were not restricted by the former

President.  *See id.* §§ 2204(b)(2), (c)(1).

Of particular significance here, the PRA provides that presidential records are subject to all

the exemptions from release under FOIA, *except for exemption 5*.  44 U.S.C. §§ 2204(c)(1).  That

is, after he has been out of office for 12 years, a President may *not* assert exemption 5 privileges to

prevent disclosure of records that reflect confidential communications with or among his advisers.

*See* 44 U.S.C. § 2204(c)(2).  To be sure, the PRA does not limit any constitutionally-based privilege

that may be available to a former President.   44 U.S.C.  § 2204(c)(2); *see also Nixon v.*

*Administrator*, 433 U.S. at 449 (constitutionally based privileges "survive[] the individual President's tenure."). Nonetheless, the PRA's 12-year limitation on assertion of exemption 5 privileges reflects Congress's determination that the candor of communications between the President and his advisors—the same purpose served by the constitutional privilege—is not threatened by disclosure of confidential material after 12 years.

In restricting exemption 5 privileges to 12 years, Congress sought to "balanc[e] the ready availability of the records against the prospect that premature disclosure might have a 'chilling effect' on Presidents and the frankness of advice they could expect from their staffs." At hearings on the bills leading up to passage of the PRA, "[m]ost witnesses . . . felt that 'a period of 10 years or less in which the President could assert some restrictions would be sufficient to accommodate these policy and legal concerns.'" *Nixon v. Freeman*, 670 F.2d at 356 n.13 (citing House Committee Report). "Congress eventually chose to allow Presidents to designate restrictions on certain materials for a maximum period of twelve years, but made the Archivist responsible for determining whether particular matters fall within those restrictions." *Id.*

Because Congress has made exemption 5 inapplicable after 12 years to presidential materials preserved by the Archivist, the President's advisors cannot have any reasonable expectation of confidentiality for such records. In particular, disclosure of records from the eight years of President's Reagan's Administration cannot possibly upset the expectations of confidentiality of current or former Presidents or presidential advisors because the PRA has been in effect since 1978, before the start of President Reagan's first term, and was applicable to presidential materials beginning with those of President Reagan.

19

Moreover, former Presidents themselves do not generally restrict access to materials of this age.  For example, by 1977, less than 14 years after the end of the Kennedy Administration, the Kennedy Library had processed 85 percent of its material, of which "only 0.6 percent [was] under donor (as distinguished from security-related) restriction."  *Nixon v. Administrator*, 433 U.S. at 450 n.12.  In the Johnson Library, less than 10 years after President Johnson left office, "review of nonclassified materials [was] virtually complete, and more than 99% of all nonsecurity classified materials [was] unrestricted."  *Id.*  Further, as of 1977, [i]n each of the Presidential libraries, provision ha[d] been made for the removal of the restrictions with the passage of time."  *Id.*[7]

More recent practice confirms that Presidents and their advisors have no justified expectation that presidential communications will remain confidential for the 30 years asserted by the Department.  For example, the "Special Files" of the Nixon Administration, containing the Administration's most sensitive material, were opened to the public beginning in 1987.  61 Fed. Reg. 48722 (1996); Nelson Decl. ¶ 2.  Although some of the records have been withheld on privacy or national security grounds, none has been withheld based on the presidential communications privilege.  Lardner Decl. ¶ 5; Nelson Decl. ¶¶ 4-8.

Similarly,  the letter deeding records from the Ford Administration to the Archivist provides that confidential communications are subject to release after 14 years.  Lardner Decl., Exh. 2 at 11.  Consistent with the deed, the Ford Library has withheld few if any records on the basis of the presidential communications privilege.  *See* Guide to Historical Materials in Ford Library,

---

[7]For presidential records prior to those of President Reagan, and with the exception of he records of President Nixon, the National Archives obtained the records by donation from the former president, subject to a deed of gift that set forth access restrictions imposed by the donor. *Nixon v. United States*, 978 F.2d 1269, 1281-83 (D.C. Cir. 1992).

www.fordlibrarymuseum.gov/library/guides/guideintro.htm#2.6. (most restrictions based on national security or privacy, "occasional other restrictions" derive from donor agreements). Accordingly, it has made its pardon records, including letters of advice, publicly available. Lardner Decl. ¶¶ 8-9; *but see id.* ¶ 10. The letters of advice were opened in full, except for "a few documents that involved an invasion of privacy unrelated to the crimes committed (mental health treatment, etc.)." *Id.* ¶ 9 & Exh. 4. Among the letters released is the April 4, 1975 letter of advice to the President regarding David Beck's clemency application, which the Department is withholding as privileged (Index # 5). *Id.*, Exh. 5. In 1985, the Ford Library released pardon documents regarding the clemency application of Iva D'Aquino, and in 1998, it released pardon documents concerning six individuals collectively referred to as the "Eisenhower military death commutation cases," including 12-year-old letters of advice. *Id.*, Exh. 3. The Ford Library has also made available papers of White House Counsel Philip Buchen and President Ford's attorney Benton Becker, concerning their advice to President Ford regarding the pardon of President Nixon. *See* www.ford.utexas.edu/library/guides/finding%20aids/buchen%2C%20philip%20%2D%20files.htm (description of Buchen papers); www.ford.utexas.edu/library/guides/finding%20aids/becker%2C%20benton%20%2D%20papers.htm (description of Becker papers).

President Carter's presidential records deed provides for confidential communications to be withheld for 20 years or until one year after President Carter's death, whichever comes later. *Id.*, Exh. 6. However, the Carter Library seems to have waived that time restriction. Currently, "[m]any of the most significant domestic policy and political affairs materials are processed and open to research. Some defense and foreign policy materials are also open." Jimmy Carter Library Reference Procedures and Services, www.jimmycarerlibrary.org/library/faq.phtml#6 ("Carter

Library Procedures").  The Carter Library is not currently asserting the privilege for any of the more than 13 million pages of documents that it has processed for release thus far.  Lardner Decl. ¶ 11. Moreover, the Library's website notes that some material is closed to the public to protect national security or personal privacy, but does not suggest that any material is withheld from the public based on presidential privilege.  *See* Carter Library Procedures.  The Carter Library has made at least two letters of advice publicly available.  Morison Decl. ¶ 19 (letters of advice released regarding Patricia Hearst and G. Gordon Liddy).  Moreover, although President Carter did not maintain many pardon records, Lardner Decl. ¶ 12, the Carter Library has provided Mr. Lardner with a list of the files indexed under "pardons" and told Mr. Lardner that those files are open to the public.  Lardner Decl. ¶ 12 & Exh. 7.

Last, because materials from the Reagan Administration are subject to the PRA, all presidential records containing advice were available under FOIA, subject to any claims of exemption (other than exemption 5) or constitutional privileges, as of January 20, 2001.  Prior to January 2001, the Reagan Library had withheld from requesters roughly 68,000 pages of material (out of more than 4.5 million pages processed) on the ground that the pages contained confidential advice to President Reagan.  John Carlin, Archivist of the United States, "Opening the Reagan Records," August 2001, available at www.archives.gov/presidential_libraries/presidential_records/ opening_ reagan_records.html.  By July 2002, all of those pages had been released.  *See* Exh. A to Statement of Material Facts.  In addition, the Archives later disclosed that an additional 1,654 pages had been withheld during the 12-year PRA period.  All but 74 of those pages have now been

released.  *See* Exh. B to Statement to Material Facts.[8]   Because the Reagan material has been

processed in response to FOIA requests, the material does not necessarily include records related

to clemency applications.   However, the release of 99.9 percent of the material that the Reagan

Administration had identified as containing confidential communications with the President

demonstrates the weakness of the privilege 12 to 13 years after the end of the presidency.[9]

The practices of the former Presidents show that any expectations of confidentiality, even

as to the most sensitive matters discussed by Presidents Nixon, Ford, Carter, and Reagan with their

advisors, have now largely if not entirely evaporated.   Consistent with the expectations of Congress

and the case law, these practices show that the exemption 5 privileges do not justify withholding the

15- to 31-year-old records at issue here.   Indeed, the Department itself released years ago some of

the very same documents it is withholding here.   Specifically, in February 1989, the Department,

in response to a FOIA request to the Office of the Pardon Attorney (to which Mr. Lardner's FOIA

requests were also directed) released many or all of its records related to Jimmy Hoffa's pardon

request.   Those records dated from 1971 through 1976, and thus were as few as 13 years old.

Moreover, at that time, the Department released in full records as to which it now claims that

exemption 5 applies, including memos from September 23, 1976 (#138), June 24, 1973 (#141),

August 2, 1973 (#142), September 24, 1976 (#143, p.1), September 24, 1973 (#148), and March 23,

---

[8]The propriety of withholding those 74 pages is currently being challenged in litigation.  Civ. No.02-447 CKK (D.D.C.).

[9]Mr. Lardner has not sent a FOIA request to the Reagan Library because, when he contacted the Library in the summers of 2002 and 2003,  he was informed by the Library that the Department had requested that it not release any pardon records.  Lardner Decl. ¶ 13.

1973 (#150),[10] and handwritten notes dated January and August 1975 (#140), August 2, 1973 (#144), and July 30, 1973 (not listed on *Vaughn* Index). *See* Lardner Decl. ¶ 14 & Exhs. 8A-8F, 9B, 9C. The Department also released in 1989 a August 6, 1973 handwritten note from the Pardon Attorney, which it now claims it is entitled to withhold under the presidential communications privilege and *Judicial Watch* (# 146).[11] *Id.*, Exh. 9D. And the Department is now withholding an August 2, 1973 memo that appears to be a memo not only released in 1989, but also released to Mr. Lardner in 2002 by the Department's Office of Legal Counsel. *Id.* ¶ 15 & Exh. 9A.

The Department's treatment of the 1989 request for pardon files related to Mr. Hoffa confirm what Congress, the case law, and the historical practice of past Presidents all demonstrate: Twelve years after the end of a presidency, presidents and their advisors no longer have an expectation of confidentiality, and the presidential communications and deliberative process privileges no longer justify withholding of records. Accordingly, the Department's exemption 5 claims cannot be sustained.

**D. The Department Has Failed To Justify Application Of The Exemption 5 Privileges For Many Of The Withheld Records.**

1. In addition to the fact that the deliberative process privilege no longer applies to documents dated from 1973 to 1989, the Department's failure to distinguish the letters of advice that

[10]The *Vaughn* Index lists a four-page March 23, 1973 memo, and the copy that Mr. Lardner has is three pages. The description on the Index, however, suggests that the memo listed is the same one released in 1989.

[11]The innocuous text of that note—which states that Fred Fielding called to ask if the Pardon Attorney could recall who suggested the condition imposed on Mr. Hoffa's pardon and that the Pardon Attorney could not recall and doubts that he was told, Lardner Decl., Exh. 9C—shows the frivolousness of the Department's suggestion that the candor of communications with the White House would be chilled by release of the records at issue.

have been released without redactions from those that have been withheld dooms its claims to the deliberative process privilege for the withheld letters.[12] Aside from the letters from 1960 to 1972, as to which the Department has recognized that the privilege does not apply, the Department has released letters of advice regarding individuals such as Jimmy Hoffa (dated 1971), Iva D'Aquino (dated 1977), and Patricia Hearst (dated 1979).  Morison Decl. ¶ 19.  Various letters of advice are available from the Carter Library, *id.*; letters from 1973 are available at the National Archives, Lardner Decl. ¶ 4, and the Ford Administration made its pardon files available to Mr. Lardner last Spring.  *Id.* ¶¶ 8-9; *but see id.* ¶ 10.

Because various letters fewer than 30 years old have been released, the Department cannot sustain its burden of showing that the deliberative process privilege applies without offering some basis to distinguish the withheld records from the released records.  That is, the Department "must demonstrate that, unlike the released [letters], the withheld [letters] would actually inhibit candor in the decision-making process if made available to the public."  *Army Times Pub. Co.*, 998 F.2d 1067, 1071-72 (D.C. Cir. 1993) ("FOIA was designed to preclude a government agency from cherry-picking the materials to be made public."); *see Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d at 1435 ("key question" is "whether disclosure would tend to diminish candor with the [the] agency"); *Wolfe v. HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988); *Lurie v. Department of the Army*, 970 F. Supp. 19, 41, 43 (D.D.C. 1997) (citing *Army Times*) (exemption 5 claim rejected where

---

[12]For the letters of advice listed in the *Vaughn* Index under the heading "Individual Case Files," the Department claims the deliberative process privilege for most of the information in the letters.  *See* Index ## 5, 25, 27, 28, 29, 79, 94, 103, 104, 186, 209.  Although the Department has not identified alternative privileges that it might claim for the approximately 5,000 letters of advice in Tab A to its index, presumably it would assert the deliberative process privilege for some of the information in those letters as well.  *See* Morison Decl. ¶¶ 24-25.

agency failed to explain how disclosure would chill frank discussion and to distinguish released information from redacted information); *see also King v. Department of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987) (agency bears burden of justifying decision to withhold information).  The point is not that the Department has waived the deliberative process privilege.  Rather, the fact that many letters of advice are publicly available in full suggests that the Department's claims of deliberative process privilege for much of the information contained in the withheld letters are unjustified.  *See Army Times*, 998 F.2d at 1071.

In short, to prevail on its exemption 5 claim, the Department must demonstrate that the withheld letters of advice, in contrast with the released letters of advice, "would actually inhibit candor in the decision-making process if made available to the public."  *Id.* at 1072.  The Department cannot make such a showing.

2.   Although the Department generally is not claiming the presidential communications privilege for letters from third parties offering recommendations about or support for a pardon application, the Department has made such claims for letters to the Pardon Attorney from judges, probation officers, and a former special prosecutor.  *See* Index ## 15, 17, 84, 88, 108, 131, 133, 201.[13]  Of course, neither a judge, a probation officer, nor a private citizen who once served as a former special prosecutor is an Executive Branch employee, much less a presidential advisor.  Thus, their letters *to the Pardon Attorney* cannot conceivably be deemed advice *to the President* by his *advisors*.  *Cf. Judicial Watch*, 365 F.3d at 1115 ("At core, presidential communications privilege

---

[13]The former special prosecutor, Archibald Cox, wrote a letter in 1988 in connection with John Ehrlichman's clemency application (Index #84), and wrote letters in 1985 and 1986 in connection with Armand Hammer's application (Index ## 131, 133).  Thus, his letters were written more than a decade after he served as special prosecutor and at a time when he held no government position.

is rooted in the President's 'need for confidentiality in the communications of his office'. . . .")
(citation omitted).  Indeed, the Department has offered no reason why letters from such individuals
are covered by the presidential communications privilege, when letters from other third parties are
not.

Similarly, the Department wrongly claims that these letters (except for Index ## 108 & 201)
are covered by the deliberative process privilege.  Disclosure of letters from individuals outside the
Department would not threaten the candor of pre-decisional discussion within the Department
because the letters do not reveal the Department's deliberations; they reveal only the views of
individuals who are not involved in the Department's deliberations about what recommendation to
make to the President.  The Department defends its assertion of the deliberative process privilege
on the theory that such individuals will be less candid in their recommendations "if they know that
their opinions will be *promptly* revealed to the public."  Morison Decl. ¶ 27 (emphasis added).  That
theory fails for two reasons.  First, this case presents no possibility of "prompt" revelation of the
letters:  The most recent one at issue is 17 years old.  *See* Index #88.  Second, the recommendations
of these individuals, who are outside of the Executive Branch, do not reflect the deliberative process
of the Department or advice to the President from his advisors, and therefore do not fall within the
scope of the deliberative process privilege.  *Department of Interior v. Klamath*, 532 U.S. at 12.[14]

3.  The Department also claims the presidential communications privilege for eight letters
sent from the Pardon Attorney to judges, probation officers, and a former special prosecutor, in

---

[14]The judges and probation officers were acting, not as consultants to the agency, but as
independent individuals making their own decisions to respond to the Department's request for a
recommendation.  To the extent any of these individuals felt duty-bound to respond, that duty would
not derive from their relationship to the agency, but from their duty as members or employees of the
Judicial Branch or as citizens.

which the Pardon Attorney requested a recommendation about a pending clemency application.  *See* Index ## 82, 83, 85, 86, 87, 107, 130, 132.  Just as the letters from these individuals to the Pardon Attorney are not covered by this privilege, as discussed above, these letters are also not covered.  They do not offer advice to the President (or anyone else); they were not received by the President or even the White House.  Indeed, they were sent to individuals outside of the Executive Branch.

4.  Similarly, the Department claims the presidential communications privilege for 14 letters from the Pardon Attorney—13 letters to individuals in other parts of the Department (the FBI, Bureau of Prisons, and United States Attorneys offices) and one letter to the Internal Revenue Service—in which the Pardon Attorney requested a recommendation or information related to a pending clemency application.  *See* Index ## 9, 13, 30, 32, 35, 44, 45, 128, 199, 200, 205, 224, 225, 227; *see also* Index #34 (letter from U.S. Attorney to acting Pardon Attorney reporting on status of response to request for recommendation).  These letters do not offer advice to the President (or anyone else).  Moreover, the fact that the Department is not claiming that the deliberative process privilege protects these intra- and inter-agency records from disclosure reflects the fact that release of the records would not chill candor in agency communications.[15]

**E.      The Department Has Withheld Records Already In The Public Domain,
         Which Are Not Covered By Exemption 5.**

Once the Department has released a document to any member of the public, any chilling effect on the deliberative process or the candor of advice given to the President has already occurred.  Accordingly, an agency cannot invoke exemption 5 to bar subsequent disclosures of a document it

---

[15]The only part of these 14 records for which the Department claims the deliberative process privilege is the portion of Index #13 that reveals the sentencing judge's recommendation about the pardon application.  *But see infra* p.30.

28

previously released.  *See In Re Sealed Case*, 121 F.3d at 741-42.  This same reasoning should apply where the document has been released by another agency.  Whether the prior release is by the same agency or a different one, the rationale behind the exemption 5 privileges becomes equally inapplicable.  *Cf. Coastal States Gas Corp.*, 617 F.2d at 863 ("The purpose of [attorney-client] privilege is limited to protection of confidential facts.  If facts have been made known to persons other than those who need to know them, there is nothing on which to base a conclusion that they are confidential."); *see also* Morison Decl. ¶ 19 (Department decided to release certain records because they had already been released by Presidential Libraries).

Here, the Department is withholding hundreds of letters of advice that have already been released to the public by others.  The Department is withholding more than 370 letters of advice from 1973, *see* Index, Tab A, yet those letters are available to the public at the National Archives.  Although in May the Archives issued a press release announcing the release of 1973 pardon records, among other Nixon presidential materials, www.archives.gov/media_desk/press_releases/nr04-60 .html, in June the Department still listed its copies of the same letters on its revised *Vaughn* index and refused to disclose them to Mr. Lardner.  For example, the Department's index shows that it is withholding a four-page letter dated December 6, 1973, and a six-page letter dated April 9, 1973.  The National Archives has released letters of advice concerning John Michael Murphy and Stanley Greenberg, which appear to be those same December 6 and April 9 letters.  Lardner Decl. ¶ 4 & Exh. 1.  The Department is also withholding the November 8, 1973 letter of advice concerning Harry Golden (Index #94), although that letter, too, has been released by the Archives.  *Id.*  Similarly, the Department is withholding approximately 750 letters of advice from the Ford Administration.  However, the Ford Library has opened its pardon files, including letters of advice.  *Id.* ¶¶ 8-9 & Exh.

4.  For example, the Department is withholding the April 4, 1975 letter of advice concerning David

Beck (Index #5); but the Ford Library has released it.  *Id.*, Exh. 5.  In addition, as explained above,

the Department is withholding records concerning Jimmy Hoffa, which it released to a reporter in

1989.  *Id.* ¶¶ 14-15 & Exhs. 8-9.

Because the 1973 letters, the letters from mid-1974 through 1976, and the Hoffa records are

already available to the public, the Department's disclosure of these records does not threaten the

candor of the advice given or the confidentiality of any communications.  Accordingly,  neither the

presidential communications privilege nor the deliberative process privilege is applicable to these

records.

Along the same lines, the Department has released to Mr. Lardner letters from the Pardon

Attorney to the judge who sentenced David Beck and to Beck's former probation officer, but in each

letter the Department has invoked the deliberative process privilege as the basis for redacting one

word that states the recipient's recommendation concerning Beck's pardon application.  Index ## 16,

18 (Lardner Decl., Exh. 12); *see also* Index #13 (judge's recommendation redacted in withheld

memo to U.S. Attorney).  These redactions are improper because the recommendations of both the

judge and the probation officer are stated in the letter of advice, which is available to the public.

Lardner Decl., Exh. 5  Moreover, as the redacted versions of the letters show, they do not reflect the

deliberations of  the Department.

## II.   SOME OF THE DEPARTMENT'S EXEMPTION 6 REDACTIONS ARE NOT NECESSARY TO PROTECT AGAINST UNWARRANTED INVASIONS OF PRIVACY.

Exemption 6 applies to "personnel and medical and similar files the disclosure of which

would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The

Department has asserted an exemption 6 privacy privilege for a broad range of names and other information in the pardon records that identifies individuals other than the clemency applicant.  Mr. Lardner does not contest withholding of social security numbers and is not pursuing withheld street addresses and telephone numbers.  However, many of the Department's privacy claims are used to withhold information that would shed light on the workings of the Office of the Pardon Attorney and for which the relevant individual can have no reasonable expectation of privacy.  *See Department of the Air Force v. Rose*, 425 U.S. 352, 372 (1976) (exemption 6 establishes balancing of individual's right to privacy against public interest in disclosure).[16]

1.   The Department has withheld on privacy grounds the names of clemency applicants, other than the specific applicants on whom Lardner is focusing, who are mentioned in responsive records listed on the primary *Vaughn* index.  *See* Index ## 40, 54, 89, 90, 172, 173, 193, 195, 196. Yet disclosure of the fact that an individual has applied for clemency would not constitute a clearly unwarranted invasion of privacy.  In fact, the Department releases the names of individuals who are granted clemency.  *See*, *e.g.*, www.usdoj.gov/pardon/recipients.htm (DOJ website listing pardons granted from 1989-2001); *see also* Lardner Decl., Exh. 13 (lists of individuals whose clemency applications were granted by President Ford).  And the Department's clemency regulations warn applicants that clemency petitions and other clemency records may not be kept confidential:  The regulations provide that although the Department will not "generally" disclose communications in connection with a clemency petition, "they may be made available for inspection, in whole or in

___

[16]The Department is claiming a 7(c) privacy exemption for "quintessentially 'law enforcement' records, including presentence investigation reports, . . . prison progress reports, . . . and FBI background investigations . . . ."  Morison Decl. ¶ 38.  Mr. Lardner is not pursuing these records.

part, when in the judgment of the Attorney General their disclosure is required by law or the ends

of justice."  Rules Governing Petitions for Executive Clemency, 28 C.F.R. § 1.5.

The Department's declarations make no specific argument to explain how disclosure would

be an unwarranted invasion of privacy.  Indeed, in its 1989 release of Hoffa pardon records, the

Department did not redact the name of another pardon applicant mentioned in the records.  *See id.*,

Exh. 10A.  The public interest would be served by releasing these names because it would provide

the identities of people who applied for clemency, and potentially provide comparative information

about the Department's evaluation of different clemency applicants, thereby shedding light on the

Department's performance of its role in the clemency process.

2.   The Department relies on exemption 6 to withhold the names of individuals who wrote

letters in support of a clemency application or who were listed as character references on pardon

applications.  *See* Index ## 19, 64, 68, 74, 91, 92, 137, 157, 171, 179, 180, 203, 212, 219, 220, 223,

237 (letter-writers); *id.* ## 63, 76, 96, 170, 182, 215 (character references).  However, the names of

individuals who contact government officials to express opinions or offer advice are not protected

by exemption 6.

In *Landmark Legal Foundation v. IRS*, 87 F. Supp. 2d 21, 27-28 (D.D.C. 2000), this Court

held that exemption 6 does not extend to the names of people who write to the IRS to express

opinions or provide information.  Likewise, in *Judicial Watch of Florida v. Department of Justice*,

102 F. Supp. 2d 6 (D.D.C. 2000), in which the plaintiff sought correspondence with the Department

about "Independent Counsel Act matters," among other things, the Court stated that although an

individual might have a privacy interest in non-disclosure of his or her identity, "such information

might well shed light on an agency's performance of its statutory duties, which is the very purpose

of FOIA and is at the heart of the public's interest in disclosure." *Id.* at 18.   Because the Department

had failed to make a specific showing that the possible privacy interest outweighed the public

interest, the Court denied the Department motion for summary judgment.   *Id.*   Here, the Department

has failed to show that an individual who corresponded with the government about a pardon

application or offered to be a character reference had any expectation of privacy or that any such

individual would be subject to harassment or abuse if his or her name were disclosed.

Moreover, the Department's clemency regulations advise third parties that their letters may

be made public: As explained above, the regulations provide that although the Department will not

"generally" disclose communications in connection with a clemency petition, "they may be made

available for inspection, in whole or in part, when in the judgment of the Attorney General their

disclosure is required by law or the ends of justice."   Rules Governing Petitions for Executive

Clemency, 28 C.F.R. § 1.5.   Accordingly, third parties who choose to communicate with the

Department with respect to a clemency application know, before they make their submission, that

their communications may become publicly available.   *Cf. Holland v. CIA*, 1992 WL 233820, *16

(D.D.C. 1992) ("FOIA requesters do not ordinarily expect that their names will be kept private;

therefore, release of their names would not trigger even the minimal invasion of privacy necessary

to trigger the [exemption 6] balancing test.") (quoting DOJ, *Freedom of Information Caselist* 464

(1990)).   Thus, in the Department's 1989 release of pardon records regarding Jimmy Hoffa, the

names of third-party letter-writers were not redacted.   Lardner Decl. ¶ 16 & Exhs. 10A-10E.[17]

---

[17]The Department has redacted the name of an individual who wrote a letter in opposition
to John Ehrlichman's pardon application.   *See* Lardner Decl., Exh. 11.   Yet the fact that the person
cc'd the presidents of the American Bar Association and the Washington State Bar Association
shows that he or she had no reasonable expectation of privacy in that letter.

On the other hand, the public has a strong interest in disclosure of the identities of people who may have influenced a decision whether to grant clemency.  Disclosure of these names would help the public to evaluate how thoroughly the Department investigated each pardon application and whether its investigation was flawed or biased.  For instance, the information might show that character references or letters of support, or non-support, from large campaign contributors or political allies seem to carry more weight with the Department than those of other people.  Thus, "[d]epriving the public of knowledge of the writer's identity would deprive the public of a fact which could suggest that their Justice Department had been steered by political pressure rather than by the relevant facts and law." *Judicial Watch of Florida*, 102 F. Supp. 2d at 18.  Or disclosure might show that letters from victims seem to carry significant weight with the Department, or no weight at all.  This information, too, would shed light on the Department's performance of its duty.

The public interest may be served by the release of the names in other ways as well.  For example, one letter in support of a request for a posthumous pardon of Marcus Garvey cited a conversation with Garvey's sentencing judge, in which the judge expressed regret at having to sentence Garvey.  To preserve the historic record, it is important to release the name of letter's author so that Mr. Lardner can try to contact him or her to document the conversation.  Accordingly, the names of third parties who wrote letters in support of or in opposition to clemency applications do not come within the scope of exemption 6 and should be disclosed.

3.   The Department has also relied on exemption 6 to withhold other pieces of information that should be released.  For example, Index ## 102, 103, and 104 show that the Department is withholding the name of someone who testified at Armand Hammer's trial—a trial that was open to the public.  That person can have no reasonable expectation of privacy in this regard, and the fact

that his or her name would appear in pardon-related documents would not constitute an unwarranted invasion of privacy, given that the name already appears in connection with the public trial.

Several similarly unjustified redactions appear in the files released by the FBI and discussed in the Keeley Declaration.  In the records regarding Frank Sturgis, the FBI redacted the name of someone sentenced in open court on a conspiracy conviction, apparently a co-conspirator of Sturgis. Lardner Decl. ¶ 20.  And in the records regarding John Ehrlichman, the FBI redacted the name of a publicly named co-defendant indicted in the Watergate conspiracy but "never prosecuted."  *Id.* Based on other records released by the Department to Mr. Lardner, Mr. Lardner thinks that the redacted name may be Gordon Strachan, who was named in "Overt Act 32" of the Watergate cover-up indictment as having delivered $300,000 in January 1973 to Fred LaRue, who later gave money to various other individuals (G. Gordon Liddy and Bill Bittman (E. Howard Hunt's lawyer)) involved in Watergate.  *Id.*  The individual whose name was redacted has no expectation of privacy in the fact that he was named in a publicly available Watergate indictment; and on this matter of historic importance, Mr. Lardner should not have to guess the person's identity.  Similarly, the FBI has redacted the name of the lawyer who represented John Ehrlichman in several lawsuits.  *Id.*  Yet that person cannot reasonably have had any expectation that the fact of his *public* representation of Ehrlichman would be deemed a *private* matter.

Invoking exemption 6, the Department has made other redactions of public information and information in which individuals can have no reasonable expectation of privacy.  Mr. Lardner has not chosen to contest each of the improper redactions.  However, disclosure of the information discussed above would help to enhance the historic record, without threatening any unwarranted invasion of privacy.

III.    **THE DEPARTMENT'S *VAUGHN* INDEX DOES NOT ADEQUATELY DESCRIBE THE WITHHELD LETTERS OF ADVICE.**

Assuming that the Department may properly rely on the presidential communications privilege to withhold the letters of advice itemized in Tab A to the *Vaughn* index, the Department's *Vaughn* index is inadequate because it fails to identify the name of the clemency applicant who is the subject of each letter.  The D.C. Circuit has held that the presidential communications privilege applies to records in their entirety and does not require segregation of non-exempt material.  *In re Sealed Case*, 121 F.3d at 745.  Nonetheless, the name of the clemency applicants should be stated in the *Vaughn* index to identify and distinguish withheld records.  This information is required by *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), which directs that the index have "specificity" so as to ensure adequate adversarial testing.  *Id.* at 827-28.  The fact that some of the letters listed on the Tab A index have the same date as others is further reason to require the Department to provide the names of the subjects to the letters, so as to distinguish among the letters and assist Mr. Lardner in identifying those letters that have been released by other sources.

The National Archives's treatment of the privilege in responding to FOIA requests for presidential records shows the inadequacy of the Department's *Vaughn* index in this regard.  As described above, the Archives has been processing FOIA requests for Reagan Administration records and, since 2001 (12 years after the end of the Administration), has been releasing material previously withheld because it contained confidential advice to the President.  Currently, the Archives has released all but 11 documents, two of which relate to pardons.  Although the records are being withheld, the Archives has released a list that sets forth the date, author, type of document, and subject matter of each document.  For example, one record is listed as "November 22, 1988, Arthur B. Culvahouse, Jr., Counsel to the President, Memorandum for the President, 'Pardon for

36

Oliver North, John Poindexter, Joseph Fernandez.' (1 copy totaling 4 pages)." Exh. C to Statement of Material Facts (listing and describing 11 memoranda). The Archives withheld the listed documents at the request of both President Reagan and President Bush, but neither apparently felt the privilege foreclosed disclosure of the nature of the documents, including the individual at issue in pardon discussions. In this case, too, an adequate *Vaughn* index requires identification of the name of the clemency applicant discussed in each withheld letter.

The Department's reliance on the presidential communications privilege does not justify the Department's failure to include the names in Tab A of its *Vaughn* index. Indeed, the notion that the Pardon Attorney or other Executive Branch staff would be less candid in giving advice if they knew that, years later, the names of clemency applicants would be publicly disclosed is far-fetched. The name of an applicant for clemency is simply not an element of advice. Thus, in the *Vaughn* index of withheld records from the individual case files, the Department has asserted the presidential communications privilege with respect to each letter of advice listed but, nonetheless, has provided the name of clemency applicant and a brief description of the content of the letter. *See*, *e.g.*, Index ## 5, 25, 79. Moreover, the names of individuals who receive clemency are publicly available from the Department. *See* www.usdoj.gov/pardon/recipients.htm (DOJ website listing pardons granted from 1989-2001). And at the Ford Library (and presumably other libraries as well), lists of the names of individuals who were granted clemency are available in the form of the document signed by the President to confer clemency. Lardner Decl., Exh. 13.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment should be granted.

Respectfully submitted,

_____/s/_____
Allison M. Zieve (DC Bar No. 424786)
Scott L. Nelson (DC Bar No. 413548)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
202-588-1000

July 29, 2004                                Counsel for Plaintiff