UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GEORGE LARDNER,           )
                          )
            Plaintiff,    )        Civil Action No. 03-0180 (JDB)
                          )
v.                        )
                          )
UNITED STATES DEPARTMENT  )
OF JUSTICE,               )
                          )
            Defendant.    )

**PLAINTIFF'S REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this Freedom of Information Act ("FOIA") case, the Department of Justice is withholding

thousands of records from the 1980s, claiming that they fall under FOIA exemption 5 because they

reveal either confidential advice provided to a former President or the deliberative process of the

Department.   In response, plaintiff George Lardner has argued primarily that the presidential

communications privilege must be invoked by the President, not by the Department, and that both

privileges have eroded over time to the point where they no longer justify withholding.   The

Department's opposition to Mr. Lardner's motion for summary judgment does not dispute either of

these arguments.   Instead, the Department seeks to divorce exemption 5 from the privileges on

which it is based by arguing that exemption 5 can protect records that the underlying privileges

cannot.   As explained below, the Department's awkward construct is unsupported by the case law.

The Department is also relying on exemption 6's protection of personal privacy to withhold

specific pieces of information.   However, with respect to the withheld information challenged in Mr.

Lardner's motion, disclosure would not threaten a clearly unwarranted invasion of privacy.  The

Department's cursory response on these issues lacks merit.

## ARGUMENT

### I.    EXEMPTION 5

The Department initially refused to disclose to Mr. Lardner thousands of responsive records

from 1960 through 1989 on the ground that the records were exempt from disclosure under

exemption 5.   The Department's primary claim was that the records could be withheld in their

entirety because they were protected by the presidential communications privilege, which is one of

the litigation privileges incorporated in exemption 5.   After Mr. Lardner brought this suit, the

Department abandoned its exemption 5 claim for records dated from 1960 through 1972, and

announced that it was applying a 30-year cut-off for its assertion of exemption 5.   On the day that

Mr. Lardner filed his motion for summary judgment, the Department announced that it was further

limiting its broad exemption 5 claim and that it would no longer assert exemption 5 for any records

dated prior to 1981 (the end of the Carter Administration).  *See* Def. Opp., Exh. 6.   Accordingly,

with respect to exemption 5, the records that remain at issue are primarily records dated from 1981

through 1989.[1]

---

[1]Three records in the individual case files are dated 1990, and two are dated 2001.  *See* Index
## 79, 89, 90, 222, 223.  The argument in part A, below, applies to all records listed in the Second
Amended Vaughn Index for which the Department claims the presidential communications
privilege.  The argument in part B applies to all records for which the Department claims either
exemption 5 privilege, except for Index ## 222 and 223.

**A.      The Presidential Communications Privilege Does Not Apply Here Because The President Has Not Asserted It.**

The Department does not dispute that the presidential communications privilege can be asserted only by a current or former President.  The Department also does not dispute that the President has not asserted the privilege for any of the thousands of pages of records withheld by the Department.  Instead, the Department claims that—although the agency cannot invoke the privilege and the President has not invoked it—it can rely on the privilege as the basis for an exemption 5 claim to avoid disclosure of agency records.  The Department is incorrect.

To begin with, the Department offers the novel theory that a President must formally assert the presidential communications privilege "only under very limited circumstances," but the agency can rely on the privilege in *any* FOIA case.  Def. Opp. 12-13.  The Department's theory is without any support.  The cases that address the presidential communications privilege in no way stand for the proposition that, in some circumstances, the privilege can be relied on without invocation by the President, but that in other "limited" circumstances,  the President must formally invoke it.  Rather, in each case, the Court recognized the privilege only after the President—no one else—authorized its invocation.  None of the cases suggests that there are circumstances in which an agency can assert the privilege when the President has not.  Indeed, the Department's theory, if accepted, would create the perverse situation in which a document could be exempt from disclosure if a member of the public requested it from the Department through FOIA, while an identical copy of the document would be publicly available from among the presidential records held by the National Archives because the privilege had not been formally invoked by the President.

Exemption 5 makes available to the government in FOIA matters the privileges that would be available to it in civil litigation.  5 U.S.C. § 552(b)(5).  Essentially, the Department's position is

that because the presidential communications privilege would be available to someone (the President, if he invoked it) in civil litigation, it is available to the agency here.  Not surprisingly, the agency offers no support for that proposition.  In civil litigation, an agency, like any other party, can only assert privileges that it holds.  For example, in litigation, the agency could not assert an attorney-client privilege to block discovery of a document sent by a third party to his lawyer.  *See generally* McLaughlin, *Weinstein's Federal Evidence* § 503.20[3] (2d ed. 2004); *cf. Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) (current corporate managers, but not former managers, can assert attorney-client privilege with respect to communications with corporate counsel, even statements of former managers themselves).  Similarly, in the FOIA context, the agency cannot properly assert exemption 5 as the basis for withholding a document, where the underlying privilege does not belong to it.[2]

For this reason, the Department's conclusory argument that *Judicial Watch v. Department of Justice*, 365 F.3d 1108 (D.C. Cir. 2004), dictates the outcome here misses the point.  *Judicial Watch* held that the presidential communications privilege may be asserted to block disclosure of certain categories of records held by the Office of the Pardon Attorney.  The court, however, expressly left open the question whether the President must personally invoke the privilege before the Department could rely on it as the basis of an exemption 5 claim.  *Id.* at 1114.  Thus, that case does not resolve the question presented here.

---

[2]Likewise, under the Department's theory in this case, it could rely on exemption 5 to avoid disclosure of material for which the President had expressly stated his desire not to invoke the presidential communications privilege, as long as the President could have invoked it had he wished. The law does not support this theory.  The Department's lawyers cannot rely on a privilege that the privilege-holder does not want to assert or has waived.  *Cf. Weinstein on Evidence*, *supra*, at 503-64 (attorney may not invoke privilege against client's wishes).

Moreover, the Department misrepresents Mr. Lardner's position when it purports to rebut an argument that the Court should balance the public's need for the withheld records against the President's interest in encouraging the candor of his advisors.  Def. Opp. 14.  Mr. Lardner has not argued that exemption 5 requires a balancing of interests.  *See*, *e.g.*, *FTC v. Grolier*, 462 U.S. 19, 28 (1983).  Mr. Lardner's point is that one reason for the requirement that the President himself invoke the presidential communications privilege is that the privilege is properly invoked only "if a *President* concludes" that disclosure "would be injurious to the public interest."  *United States v. Nixon*, 418 U.S. 683, 713 (1974) (emphasis added).  The fact that the President takes the public interest into account in deciding whether to assert the privilege does not mean that, after the President invokes the privilege, a court in a FOIA action should review the President's decision to determine whether he properly considered the public interest or that a court should consider the public interest in an exemption 5 FOIA case.  That is, if the President invokes the privilege, Mr. Lardner agrees that a court in a FOIA case should not perform its own balancing to assess whether the President was correct to do so.  Here, however, the President has not invoked the privilege.

Finally, citing *Cheney v. United States District Court*, 542 U.S. __, 124 S. Ct. 2576 (2004), the Department attempts to fashion an argument that requiring the President to assert the privilege would impose an undue burden on him.  In *Cheney*, the Supreme Court considered whether the court of appeals could review on mandamus a district court discovery plan that required the Vice President to produce certain material related to a working group convened to provide advice to the President about energy policy.  The court of appeals had held that the appropriate procedure would be for the Vice President to assert objections, including executive privilege, on a document-by-document basis in the district court, rather than seeking mandamus review of the discovery plan.  The Supreme

Court ruled that the court of appeals erred in holding that it lacked mandamus jurisdiction.  The Court held that, rather than forcing the government to assert privilege and then having to evaluate and balance the Executive's privilege claims against the Judiciary's need for the information, the lower courts should have explored other avenues of resolving the matter.  For example, the courts could have narrowed the scope of the discovery outlined in the challenged plan.  *Id.* at 2592.

The circumstances in this case do not at all resemble those in *Cheney*.  Here, there are no alternative avenues to explore before requiring the President to decide whether to invoke the privilege—the question is simply whether the privilege has been invoked.  And here, the President's assertion of privilege would not have triggered the judicial balancing of needs that the Court in *Cheney* sought to avoid—the parties agree that, if it were and remained applicable and were properly invoked, the privilege would bar disclosure under FOIA.  Thus, *Cheney* does not help the Department here.

**B.      Neither Exemption 5 Privilege Asserted By DOJ Protects The Records At Issue Here, Which Are 14 To 23 Years Old.**

Whether or not the presidential communications privilege has been properly invoked, neither it nor the deliberative process privilege justifies the Department's withholding.  Rather, both privileges erode over time, such that neither protects from disclosure the 14- to 23-year-old records at issue in this case.[3]  The Department's position that exemption 5 has no temporal boundaries, even if the privileges on which it is based do, is illogical and without merit.  *See EPA v Mink*, 410 US 73,

---

[3]The Department suggests that Mr. Lardner has conceded the applicability of the presidential communications privilege by arguing that the exemption 5 privileges have eroded over time.  As should be obvious, the erosion argument is made in the alternative, insofar as it applies to the presidential communications privilege.  The argument does not alter the force of either the argument that the privilege does not cover these records at all (Pltf. Mem. I.A) or the alternative argument that the privilege can be invoked only by the President (*id*. I.B.).

91 (1973) ("It appears to us that Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, common-sense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies.").

The Department does not dispute that the presidential communications privilege erodes over time.  Indeed, its recent decision to release to Mr. Lardner records from 1972-1980 reflects its recognition of that fact.  *See* Def. Opp., Exh. 6.  Instead, it points out that "there 'is no fixed number of years that can measure the duration of the privilege.'" Def. Opp. 18 (citing *Nixon v. Freeman*, 670 F.2d 346, 356 (D.C. Cir. 1982)).  Mr. Lardner agrees.  *See* Pltf. Mem. 17.  The Department's point, however, is the beginning of the inquiry, not the end.  To fall within the scope of exemption 5, the agency must show that the records at issue would "normally" be protected from discovery in civil litigation.  *FTC v. Grolier*, 462 U.S. at 28.  If 14-year-old or 20-year-old or 24-year-old records are not normally protected from discovery under the presidential communications privilege or the deliberative process privilege, then exemption 5 does not apply.

With respect to the presidential communications privilege, the Department makes no effort to dispute the Presidents' historical practice of releasing their most confidential papers in fewer than 14 years.  Similarly, the Department does not contest that Congress, through the Presidential Records Act ("PRA"), expressed its view that 12 years is normally a sufficient length of time to withhold confidential presidential communications from disclosure to the public.  Instead, the Department focuses on the PRA language stating that its provisions "shall [not] be construed to confirm, limit, or expand any constitutionally based privilege which may be available to an incumbent or former President."  Def. Opp. 18 (quoting 44 U.S.C. § 2204(c)(2)); *see* Pltf. Mem. 18. Citation to this provision, however, begs the question whether the constitutionally-based privilege

still protects presidential communications after 14 to 24 years.  Notably, although the Department states the purpose of the privilege, it does not offer any argument to explain how that purpose is served by extending the privilege to records that are as old as those at issue here.  And the notion that exemption 5 applies to records without regard to their age, even when the privileges encompassed in exemption 5 do not, is not "[c]onsistent with the Act's goal of broad disclosure," under which the "exemptions have consistently been given a narrow compass."  *DOJ v. Tax Analysts*, 492 U.S. 136, 151 (1989).

Relying on *FTC v. Grolier*, 462 U.S. 19, the Department argues that the Court should assume that the records at issue would *normally* be privileged in civil litigation.  Def. Opp. 19 (emphasis in original).  The Department asks the Court to make this assumption without considering whether either the presidential communications privilege or the deliberative process privilege is *normally* available to protect 14- to 24-year-old records from discovery in civil litigation.  *Grolier*, however, supports the opposite proposition.  In that case, the Supreme Court held that attorney work-product materials fell within the scope of exemption 5.  To reach this conclusion, the Court first examined the duration of the work-product protection to determine whether it normally extended beyond the course of the litigation for which the materials were prepared.  Finding that courts "routinely" extended work-product protection after "termination of the litigation for which the documents were prepared, without regard to whether other related litigation is pending or contemplated," the Court held that the work-product materials at issue fell within the scope of exemption 5.  *Id.* at 26-27.

Thus, *Grolier* shows that the inquiry for purposes of exemption 5 is not simply whether a privilege is normally available in civil litigation, but whether it is normally available *at the point in time when the FOIA issue is being considered*.  In other words, the question is not whether, in civil

litigation, the privileges asserted here might normally be available to an agency to protect against discovery of pardon records, but whether the privileges would normally be available to protect against discovery of 14 to 24-year-old pardon materials. They would not, and the Department makes little attempt to argue otherwise.[4]

## C.   The Deliberative Process Privilege Does Not Cover Recommendation Letters From Judges And Former Special Prosecutors.

Although it has abandoned its claim that letters to the Pardon Attorney from individuals outside the Department are exempt from disclosure under the presidential communications privilege, the Department continues to assert the deliberative process privilege as the basis for withholding three letters from two former special prosecutors and one letter from a federal judge.[5] *See* Index ## 84, 88, 131, 133. None of the three individuals was an employee of the Executive Branch. Nonetheless, the Department claims that exemption 5 applies because the three men are analogous to agency "consultants." Def. Opp. 24-25. Notably, the Department does not suggest that the letters carried more weight in the deliberative process than letters from family, neighbors, co-workers, or victims, or that these three individuals believed themselves to be acting as consultants—rather than

---

[4]Mr. Lardner's opening memorandum argued that the Department had failed to distinguish letters of advice from the 1970s that had been released to the public from those that had not been released, as required by *Army Times Publishing Co. v. Department of the Air Force*, 998 F.2d 1067 (D.C. Cir. 1993). *See* Pltf. Mem. 24-26. Oddly, the Department addresses this point in its opposition, without pointing out that it has now agreed to release all letters of advice through January 1980. *See* Def. Opp. 20-22. The Department's agreement to release those letters moots this argument.

[5]In his opening memorandum, Mr. Lardner also argued that the Department had improperly asserted exemption 5 as the basis for withholding four other letters to the Pardon Attorney and 22 letters from the Pardon Attorney to various individuals soliciting recommendations or information about a pending pardon application. *See* Pltf. Mem. 26-28. The Department has now released all of these records. *See* Def. Opp., Exh. 6.

acting out of self-interest or a sense of personal duty called for by citizenship or membership in the Judicial Branch.

Citing *Ryan v. Department of Justice*, 617 F.2d 781 (D.C. Cir. 1980), the Department attempts to distinguish the four letters from other letters written in connection with clemency applications by arguing that these letters were solicited by the Department.  In *Ryan*, the D.C. Circuit broadly read exemption 5 to cover particular documents that were part of the deliberative process and had been solicited by the Department, but not generated by it.  However, the records at issue in that case were at least created by senators, not private citizens like the two who wrote three of the four records at issue here.  More importantly, in *Department of Interior v. Klamath*, 532 U.S. 1 (2001), the Supreme Court strongly suggested that it disagreed with *Ryan* because the senators would have been expressing their "personal views on the matter."  *See id.* at 12-13 n.4.  The same is true here:  The four letters provide the writers' personal views, and there is no reason to assume that the letter writers believed themselves to be acting as "intra-agency or inter-agency" consultants. As the Supreme Court admonished the government in *Klamath*, the Department is wrong to suggest that "'intra-agency' is a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential."  *Id.* at 12.

## II.  DISCLOSURE OF MANY OF THE NAMES WITHHELD BY THE DEPARTMENT WOULD NOT CONSTITUTE A CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY.

1.      Addressing Mr. Lardner's argument that exemption 6 does not justify withholding the names of clemency applicants, the Department does not even attempt to identify a privacy interest that the named individuals might have in keeping the fact that they applied for clemency secret.  The Department does not even tell the Court whether the fact that any of these individuals

applied for clemency is not publicly available information (for example, because clemency was granted or because the person or his family disclosed the information themselves).  This omission is significant because prior disclosure of the names would diminish whatever privacy interest there might be.  *See Department of State v. Washington Post Co.*, 456 U.S. 595, 603 n.5 (1982) (public nature of information may be reason to conclude that release would not constitute clearly unwarranted invasion of privacy); *see, e.g.*, *The Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995); *Detroit Free Press v. DOJ*, 73 F.3d 93, 96-97 (6th Cir. 1996).

Instead, the Department argues in conclusory fashion only that the public has no interest in knowing the names of clemency applicants.  This argument is incorrect.  Each of the redacted names appears in a document that also addresses a well-known clemency applicant, such as John Ehrlichman or John Mitchell.  Comparing the Department's treatment of well-known applicants to other applicants might well shed light on its performance of its duties with respect to pardons.  In addition, if the names were not already publicly known clemency applicants, their release would open up to Mr. Lardner other avenues of research with which to further the public's knowledge of the Pardon Attorney's role in the clemency process and the President's performance of his duties in this regard.  *See Painting & Drywall Work Pres. Fund v. HUD*, 936 F.2d 1300, 1303 (D.C. Cir. 1991) (derivative use is cognizable public interest under FOIA); *see, e.g.*, *Sheet Metal Workers Int'l Ass'n v. Department of Veteran Affairs*, 940 F. Supp. 712 (E.D. Pa. 1995) (strong public interest in disclosure of names in payroll records based in part on unions' ability to monitor compliance with statutory requirements by interviewing named workers); *Ray v. DOJ*, 852 F. Supp. 1558 (S.D. Fla. 1994) (logs identifying interdicted Haitian nationals could not be withheld under exemption 6 because public had interest in follow-up interviews that were impossible without release of names).

11

Moreover, the Department's failure to identify a privacy interest to weigh against the public interest dooms its exemption 6 claim.  As the D.C. Circuit has held, "something . . . outweighs nothing every time."  *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989), *quoted in Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999).

      2.      Turning to the Department's redaction of the names of individuals who wrote letters in connection with individual clemency applications, the Department concludes that the balance of public and private interests weighs in favor of privacy but dismisses without discussion the public interest described by Mr. Lardner and the cases he cites in support of his argument.  Pltf. Mem. 32, 34.  In fact, disclosure of the names of people who wrote to the Department in connection with a pardon application would reveal whether recommendations from certain people—victims, campaign contributors, politically important people—have carried more weight with the Department than others.  *See also id.* at 34 (discussing public interest in specific letter in Garvey file).  On the other hand, the Department neither promises confidentiality, *see id.* at 33, nor, outside of this case, consistently provides confidentiality.  Thus, the Department offers no response to the fact that, in its 1989 FOIA release, it did not redact the names of third-party letter writers.  *Id.*; Lardner Decl. ¶ 16 & Exhs. 10A-10E.  Accordingly, notwithstanding the Department's cursory argument to the contrary, exemption 6 does not justify the withholding of the names of third party letter writers.[6]

      3.      Finally, the Department has redacted the names of certain individuals who could not possibly have any expectation of privacy in this regard: the name of a witness at a public trial, the name of someone sentenced in open court on a conspiracy conviction (apparently a co-conspirator

---

      [6]In addition to the Index numbers listed on page 32 of Mr. Lardner's opening memorandum in support of his motion for summary judgment, this argument also applies to the Index item inserted by the Department between numbers 156 and 157 in the Second Amended *Vaughn* Index.

of Frank Sturgis), the name of a co-defendant of John Ehrlichman, and the name of John

Ehrlichman's lawyer.  The Department's sole explanation for these redactions is to cite an inapposite

case, *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989).

To begin with, *Reporters Committee* addressed the withholding under FOIA exemption 7(c)

of rap sheets for specific individuals.  *Id.* at 762 & n.12.  Although the arrests and convictions listed

in the rap sheets listed information that was not confidential, the Supreme Court held that the

compilation of this information implicated substantial privacy interests, as much of the information

would otherwise be forgotten by the public if not for the government's maintenance of a

computerized log.  *Id.* at 771.  Here, the government has asserted exemption 6, not exemption 7(c),

which weights the FOIA balance more strongly in favor of withholding than does exemption 6.  *Id.*

at 756.  Moreover, the withheld information in this case is very specific, unlike the rap sheets at

issue in *Reporters Committee*.  This distinction is particularly important because the Court tied the

privacy interest in *Reporters Committee* to the fact that the information sought was a comprehensive

record of an individual's criminal history that was unavailable through other means.

Furthermore, in *Reporters Committee*, the Court observed that the information requested was

not sought to shed light on the government's performance of its duties, but to investigate specific

individuals' criminal activity.  *Id.* at 773.  In contrast, here, Mr. Lardner is not researching the

history  of specific individuals, but the government's use of the pardon power.  A complete record

may lead to other avenues of research or may show how the individuals whose names were redacted

affected the Department's treatment of the pardon applications in which the redactions appear.  The

public interest easily outweighs the de minimis private interest in the withheld information.

13

III.    **THE DEPARTMENT'S *VAUGHN* INDEX DOES NOT ADEQUATELY DESCRIBE THE WITHHELD LETTERS OF ADVICE.**

As this Court has recognized, a *Vaughn* index should disclose "as much information as possible without thwarting the [claimed] exemption's purpose."  Order, Feb. 4 , 2004, at 3 (quoting *King v. Department of Justice*, 830 F.2d 210, 224-25 (D.C. Cir. 1987)); *see also Lykins v. Department of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984) ("[W]e have required that as much information as possible be made public.").  The Department has refused to include in its *Vaughn* index the name of the clemency applicant that is the subject of each withheld letter listed in Tab A to its index.  Yet it nowhere suggests that disclosing this information would in any way "thwart[] . . . the purpose" of the privilege on which it relies.

As discussed above, when addressing Mr. Lardner's exemption 5 arguments, the Department contends that it is not invoking the presidential communications privilege per se but only exemption 5.  Here, addressing the adequacy of its *Vaughn* index, the Department takes the opposite approach: It seeks to avoid requirements imposed by FOIA by relying on the presidential communications privilege.  The Department thus argues that it need not provide the names because the presidential communications privilege covers the letters in their entirety.  Def. Opp. 30.  However, like the dates of the letters, the names of the clemency applicants that are the subject of the letters are not pieces of advice.  Disclosing the names would not reveal the substance of any advice to the President, nor could it conceivably threaten the candor of communications from presidential advisors in the future.  Accordingly, although the Department has claimed the privilege for letters of advice from the individual case files, its *Vaughn* index provides the names and a brief description of those letters. *See* Index ## 5, 29, 79, 103, 104, 186.  Likewise, the National Archives' privilege log with respect to a pardon document withheld from the public on the basis of the presidential communications

14

privilege sets forth the name of the pardon applicant.  *See* Pltf. Mem. 36-37; Stat. of Mat. Facts.,

Exh. C.  These examples show that the applicant's name is a piece of identifying information that,

like the date and the author, is not properly withheld.

## CONCLUSION

For the foregoing reasons and the reasons set forth in plaintiff's memorandum in support of

its motion for summary judgment or, in the alternative, for a more adequate *Vaughn* index, plaintiff's

motion for summary judgment should be granted or, in the alternative, defendant should be ordered

to produce a more adequate *Vaughn* index.  Defendant's cross-motion should be denied.

Respectfully submitted,

/s/
Allison M. Zieve (DC Bar No. 424786)
Scott L. Nelson (DC Bar No. 413548)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
202-588-1000

Counsel for Plaintiff

September 28, 2004