## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GEORGE LARDNER,

    Plaintiff,

      v.

UNITED STATE DEPARTMENT OF
JUSTICE,

    Defendant.

Civil Action No.  03-0180 (JDB)

## MEMORANDUM OPINION

This action arising under the Freedom of Information Act ("FOIA") concerns certain

pardon documents in the custody of the Office of the Pardon Attorney (a component of defendant

Department of Justice).  Plaintiff is a reporter writing a book on the use of the presidential pardon

power who filed a FOIA request seeking letters of advice (the recommendation from the

Attorney General to the President regarding pardon requests) generated from 1960 to 1989, and

the complete pardon files of twenty-five prominent individuals.  Defendant provided plaintiff

with thousands of pages of documents, but withheld hundreds of pages more, claiming that they

are protected from disclosure under Exemption 5 of FOIA because they fall within the ambit of

the presidential communications and deliberative process privileges.  Defendant also redacted

certain information from many of the released documents pursuant to Exemptions 6 and 7(C),

citing personal privacy concerns.

After plaintiff commenced this litigation, defendant voluntarily released many of the

documents at issue, including all documents generated prior to the Reagan Administration that it

had previously withheld under Exemption 5.  However, defendant continues to withhold Reagan

Administration documents under Exemption 5, and certain information from released documents

under Exemptions 6 and 7(C).  Plaintiff now challenges many of these decisions, arguing that

defendant cannot rely on the presidential communications privilege because the President has not

personally invoked the privilege, that the presidential communications and deliberative process

privileges in these documents have eroded over time to the point that they can no longer serve as

the basis for an Exemption 5 claim, and that four recommendation letters solicited by the Pardon

Attorney from special prosecutors and a judge are not "intra-agency" documents within the

meaning of Exemption 5.  Plaintiff also contends that defendant should disclose the names of

unsuccessful pardon applicants (when they appear in the pardon records of other individuals),

individuals supporting clemency applicants, and certain third parties identified in FBI

investigative files, all of which have been redacted under Exemptions 6 or 7(C).

The parties have filed cross-motions for summary judgment, and plaintiff has also moved

for a more complete Vaughn index.  For the reasons set out below, the Court concludes that the

Department properly withheld the remaining documents at issue under Exemption 5 and redacted

the names of individuals in FBI investigative files from any released documents.  The Court also

holds that defendant need not provide a more definite Vaughn index.  However, the Court holds

that it was improper for the Department to withhold on personal privacy grounds the identity of

unsuccessful pardon applicants and individuals supporting clemency applications from the

disclosed pardon documents in which they appear.

## BACKGROUND

The material facts are not in dispute.  Plaintiff George Lardner, Jr. is a Washington Post

reporter who is writing a book on the presidential use of the pardon power.[1]  See Decl. of George

Lardner, July 27, 2004 ("Lardner Decl.") ¶¶ 1-2.  As part of his research, he sent FOIA requests

to defendant seeking two categories of records in the custody of the Office of the Pardon

Attorney:  all "letters of advice" (the reports from the Attorney General or his designee to the

President advising whether to grant or deny requests for pardons) generated from 1960 to 1989,

and the complete files of the pardon applications of twenty-five prominent individuals (including

John Ehrlichman, James Hoffa, and Julius and Ethel Rosenberg).  See id. ¶ 3; Decl. of Samuel T.

Morison, June 20, 2003 ("Morison Decl.") ¶¶ 12-13.

At first, defendant refused to release any of the letters of advice, claiming that they are

exempt from disclosure under 5 U.S.C. § 552(b)(5) ("Exemption 5"),[2] because they fall within

the ambit of the presidential communications privilege.  Defendant also redacted portions of the

letters under 5 U.S.C. § 552(b)(6) ("Exemption 6")[3] and 5 U.S.C. § 552(b)(7)(C) ("Exemption

7(C)")[4], due to personal privacy concerns.  Defendant released more than 10,000 pages of

---

[1]  The pardon power includes several different acts of clemency, including what is formally known as a "pardon" (forgiveness for a crime after the sentence is served) and a "commutation" (release from prison).  Decl. of Roger Adams, June 19, 2003,  ¶¶ 3, 9-12. Plaintiff's FOIA request includes documents relating not only to the pardon power, but also to other acts of clemency.   Nonetheless, the parties often refer to pardon and clemency interchangeably, and this Court will do so as well.

[2]  Exemption 5 protects from disclosure any "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  Id. § 552(b)(5).

[3]  Exemption 6 exempts from disclosure any "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  Id. § 552(b)(6).

[4]  Exemption 7(C) allows an agency to withhold certain records or information compiled for law enforcement purposes.  Id. § 552(b)(7)(C).

documents from the pardon applications of the prominent individuals, but it declined to release

an additional 1,500 pages under Exemption 5, citing the presidential communications and the

deliberative process privileges.[5]  Defendant also redacted portions of these records under

Exemptions 6 and 7(C), again for personal privacy reasons.[6]  See Lardner Decl. ¶¶  2-3; Morison

Decl. ¶ 13-16.

On February 4, 2003, Lardner brought this action against the Department of Justice,

demanding the release of all of the documents withheld under Exemption 5, and some of the

information withheld under Exemptions 6 and 7(C).  Defendant filed a motion for summary

judgment and submitted a Vaughn index outlining the withheld materials.  Plaintiff responded

with a motion to compel production of a new Vaughn index.  On February 4, 2004, this Court

granted plaintiffs' motion and issued an order requiring defendant to submit a revised Vaughn

index that includes the dates of withheld records.

Shortly thereafter, defendant moved to stay the case to await a decision in Judicial Watch

v. Department of Justice, a case then pending before the D.C. Circuit in which the Department of

Justice had withheld pardon documents generated during the Clinton Administration under

Exemption 5 on the basis of the presidential communications and deliberative process privileges.

On March 9, 2004, this Court granted the motion to stay and on May 7, 2004, the D.C. Circuit

issued its decision in Judicial Watch, holding that the presidential communications privilege only

---

[5]  The Department of Justice referred many of the documents to other agencies.  The documents referred to the Internal Revenue Service were withheld in full under 5 U.S.C. § 552(b)(3).  Plaintiff is not challenging the refusal to disclose these documents.  Morison Decl. ¶ 16.

[6]  Two records were withheld in full on privacy grounds.  See Third Decl. of Samuel T. Morison, June 21, 2004, ¶ 9.

"applies to pardon documents 'solicited and received' by the President or his immediate advisors in the Office of the President," and that "internal agency documents that never make their way to the Office of the President" are "more appropriately examined under the deliberative process privilege."  365 F.3d 1108, 1123 (D.C. Cir. 2004).

Meanwhile, the scope of this action was narrowing.  Early on, defendant had announced that it would no longer assert Exemption 5 privileges for documents that were more than thirty years old.  See Morison Decl. ¶¶ 17-18, 22-24.  Defendant then acknowledged that four documents from the Ford and Carter administrations that it had earlier withheld under Exemption 5 had been made public at the Presidential Libraries holding the records.  Defendant therefore informed plaintiff that it would make a discretionary release of these documents.  See Morison Decl. ¶ 19.  Most recently, defendant notified plaintiff that it would no longer assert Exemption 5 for any Ford and Carter administration pardon records, and it began the process of releasing these documents to plaintiff.  See Def. Mem., Ex. 6 (July 29, 2004, Letter from John Tyler to Alison Zieve).

As a result of these disclosures, defendant now raises Exemption 5 arguments almost exclusively for documents generated during the Reagan Administration.[7]  Defendant also continues to redact information from these and earlier records for reasons of personal privacy under Exemptions 6 and 7(C).  The records still at issue consist of  more than 3,000 pages of letters of advice, and hundreds of pages of other pardon documents from the files of the twenty-five prominent pardon applicants.  The parties have now filed cross-motions for summary

---

[7]  The only exceptions are five more recent documents from the pardon files of prominent individuals.  See Second Am. Vaughn Index # 79, 89, 90, 222, 223.

judgment regarding these remaining documents, and defendant has also submitted a revised

Vaughn index.[8]

Plaintiff challenges the refusal to disclose the remaining documents on several grounds.

Plaintiff contends that Exemption 5 cannot be used to withhold the remaining documents,

because the President never personally invoked the presidential communications privilege, and

the presidential communications and deliberative process privileges have eroded over time to the

point that they can no longer justify withholding.  Plaintiff also contends that four letters from

judges and special prosecutors to the Pardon Attorney are not "intra-agency" documents within

the meaning of Exemption 5.  Plaintiff further argues that some of the names redacted from

pardon file documents under Exemptions 6 and 7(C) -- the names of unsuccessful pardon

applicants, individuals supporting clemency applicants, and certain third parties in FBI records --

should be disclosed.  Finally, plaintiff argues that the most recent Vaughn index is inadequate

because it does not reveal the names of the pardon applicants who are the subjects of the letters

of advice.

A hearing was held on the cross-motions for summary judgment on December 16, 2004.

At the hearing, counsel for defendant represented that the Department of Justice regards the

withholding of agency documents under Exemption 5 of FOIA due to the deliberative process

privilege as a far different act than the invocation of the privilege itself in civil discovery.

---

[8] The revised index reflects this Court's earlier order in the case, defendant's own decision to withdraw privileges for records generated before 1981, and the D.C. Circuit decision in Judicial Watch.  Judicial Watch held that communications among individuals outside of the White House are not protected by the presidential communications privilege.  Judicial Watch, 365 F.3d at 1123.  Defendant has continued to withhold these documents on the basis of the Exemption 5 deliberative process privilege.  Def. Mem. at 7.

Therefore, counsel for defendant explained, its officials use different language in asserting the

Exemption than in invoking the privilege.  The Court instructed counsel for defendant to submit

a declaration from a responsible person within the Department of Justice confirming this

representation.  Tr. of Motions Hg., Dec. 14, 2004, at 74-75.  On January 18, 2005, defendant

filed the declaration of Assistant Attorney General Peter D. Keisler of the Civil Division of the

Department of Justice, attesting "that the language used by the Department formally to invoke

privilege in a civil discovery context is consistently different from the language used by the

Department in declarations that are filed in FOIA litigation in which Department records have

been withheld under FOIA Exemption 5 pursuant to privilege."  Decl. of Peter D. Keisler, Jan.

18, 2005, ¶ 16.[9]

### STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

if the pleadings on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).  Material facts are those that "might affect the outcome of the suit under the

---

[9] Here, defendant explained its view that the documents it is withholding fall within the presidential communications and deliberative process privileges and are therefore protected from disclosure under Exemption 5 in a declaration submitted by an Attorney-Advisor in the Office of the Pardon Attorney.  See Morison Decl. ¶ 23 ("Those records that plaintiffs seeks . . . that were authored or solicited and received by Justice Department officials in the course of preparing and providing information and recommendations to assist the President in the exercise of his constitutional pardon power, fall within the presidential communications privilege and are therefore protected from disclosure under Exemption 5."); id. ¶ 24 ("[T]he Department's letters of advice to the President in particular clemency cases satisfy the requirements for exemption from mandatory disclosure pursuant to the deliberative process privilege of Exemption 5."); id. ¶ 26 ("In addition to the letters of advice, other documents contained in OPA's case files . . . are also subject to the deliberative process privilege . . . .").

governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party seeking

summary judgment bears the initial burden of demonstrating an absence of a genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Tao v. Freeh, 27 F.3d 635, 638

(D.C. Cir. 1994).

In considering whether there is a triable issue of fact, the Court must draw all reasonable

inferences in favor of the non-moving party.  Anderson, 477 U.S. at 255; see also Washington

Post Co. v. United States Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).

The party opposing a motion for summary judgment, however, "may not rest upon the mere

allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a

genuine issue for trial."  Anderson, 477 U.S. at 248.  The non-moving party must do more than

simply "show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Moreover, "any factual assertions in the movant's affidavits will be accepted as being true

unless [the opposing party] submits his own affidavits or other documentary evidence

contradicting the assertion."  Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992) (quoting Lewis v.

Faulkner, 689 F.2d 100, 102 (7th Cir. 1982)). The mere existence of a factual dispute by itself,

however, is not enough to bar summary judgment.  The party opposing the motion must show

that there is a genuine issue of material fact.  See Anderson, 477 U.S. at 247-48.  To be material,

the fact must be capable of affecting the outcome of the litigation; to be genuine, the issue must

be supported by admissible evidence sufficient for a reasonable trier of fact to find in favor of the

nonmoving party.  See id.; Laningham v. United States Navy, 813 F.2d 1236, 1242-43 (D.C. Cir.

1987).

FOIA cases are typically and appropriately decided on motions for summary judgment. Miscavige v. IRS, 2 F.3d 366, 368 (11th Cir. 1993); Rushford v. Civiletti, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980).  In a FOIA case, the court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); see also Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

Agency affidavits or declarations must be "relatively detailed and non-conclusory." SafeCard Services v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  Id. (internal citation and quotation omitted).  An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements."  Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and quotation omitted).

## ANALYSIS

Plaintiff contends in its motion for summary judgment that defendant has improperly withheld letters of advice and other pardon documents on the basis of the presidential communications and deliberative process privileges under Exemption 5; that defendant has unlawfully redacted certain names from these documents under Exemptions 6 and 7(C); and that

9

defendants' revised <u>Vaughn</u> index continues to fall short of the disclosure necessary for the Court

to assess defendant's claims of exemption.  The Court will address each of these arguments in

turn.

## I.    Exemption 5

FOIA mandates the disclosure of records held by a federal agency unless the documents

fall within one of several statutory exemptions.  5 U.S.C. § 552.  Exemption 5 provides that an

agency may withhold "inter-agency or intra-agency memorandums or letters which would not be

available by law to a party . . . in litigation with the agency."  <u>Id.</u> § 552(b)(5).  The Supreme

Court has read this language to mean that a document must "fall within the ambit of a privilege

against discovery under judicial standards that would govern litigation against the agency that

holds it."  <u>Dep't of the Interior v. Klamath</u>, 532 U.S. 1, 7-8 (2001).  "The test under Exemption 5

is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of

relevance."  <u>Fed. Trade Comm'n v. Grolier, Inc.</u>, 462 U.S. 19, 23-28 (1983); <u>Rockwell Intern.</u>

<u>Corp. v. United States Dep't of Justice</u>, 235 F.3d 598, 606 (D.C. Cir. 2001).

Defendant claims that the remaining documents at issue in this case are protected from

disclosure under FOIA because they fall within the ambit of either the presidential

communications privilege or the deliberative process privilege.  Although "closely affiliated, the

two privileges are distinct and have different scopes."  <u>In re Sealed Case</u>, 121 F.3d 729, 745

(D.C. Cir. 1997).  "Both are executive privileges designed to protect executive branch

decisionmaking, but one applies to decisionmaking of executive officials generally, the other

specifically to decisionmaking of the President."  <u>Id.</u>  The presidential communications privilege

"applies to documents in their entirety, and covers final and post-decisional materials as well as

pre-deliberative ones." Id.  The deliberative process privilege, on the other hand, only applies to information that is "predecisional" and "deliberative." Id. at 737; Petroleum Info. Corp. v. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

Plaintiff contends that the pardon documents in this case would not be routinely or normally withheld in civil litigation for two reasons, each mentioned in Judicial Watch.  First, plaintiff argues that the President must personally invoke the presidential communications privilege to protect documents from disclosure under Exemption 5 on the ground that they fall within the ambit of the privilege.  See Judicial Watch, 365 F.3d at 1114.  Second, plaintiff maintains that the presidential communications privilege and the deliberative process privilege have eroded over time, and can no longer justify withholding the Reagan-era documents that remain undisclosed in this case.  See id. at 1124.  Finally, plaintiff argues that the pardon files sent by judges and special prosecutors to the Pardon Attorney are not "intra-agency" documents within the meaning of Exemption 5.

### A.      Personal Invocation of Presidential Communications Privilege

Plaintiff contends that the President must personally invoke the presidential communications privilege in civil litigation, and he should therefore be required to do so as well under Exemption 5.  The President has not invoked the privilege in this case.  Instead, an attorney-advisor in the Office of the Pardon Attorney submitted a declaration explaining that the documents fall within the scope of the presidential communications privilege.  Plaintiff argues that defendant should not be permitted to withhold pardon documents under Exemption 5 until such time as the President personally reviews the relevant documents and invokes the presidential communications privilege, as he would be required to do in civil discovery in like

11

circumstances.

Even assuming that the President must personally invoke the presidential

communications privilege in civil discovery,[10] the Court concludes that this rule should not be

imported into the far different context of FOIA.  The Supreme Court has read Exemption 5 to

protect from disclosure any documents that  "fall within the ambit of a privilege" such that they

would not be "'routinely' or 'normally'" disclosed in civil discovery upon a showing of relevance.

Klamath, 532 U.S. at 7-8; Grolier, 462 U.S. at 26-27.  These principles create a divide between

the rules of FOIA and civil discovery.  There will be many cases in which a document should be

withheld under Exemption 5 of FOIA because it falls "within the ambit" of a privilege, but the

document nonetheless would be discoverable in certain circumstances in civil litigation.

Supreme Court made this much clear in Fed. Trade Comm'n v. Grolier, Inc.  There,

the Federal Trade Commission ("FTC") had conducted an investigation of one of Grolier's

---

[10]  It is not clear that this is the law.  In Judicial Watch, the D.C. Circuit explained that "the issue of whether a President must personally invoke the privilege remains an open question, see In re Sealed Case," but that since the issue was not raised in the district court, "the court need not decide it now."  365 F.3d at 1114 (citation omitted).  The parties seem to view this language as a statement that the need for personal invocation under FOIA is an open question.  But In re Sealed Case was not a FOIA action.  Rather, it involved the White House's refusal to produce certain documents in response to a grand jury subpoena.  See 121 F.3d at 734-36.  The court treated the question as one guided by the Federal Rules of Civil Procedure, and when it discussed the issue whether the President must invoke the presidential communications privilege himself, it only went so far as to say that certain cases "might suggest" that rule, but that "[w]e need not decide" the issue because the record indicated that the President personally invoked the privilege there (and, in any event, the issue was not raised on appeal).  Id. at 745 n.16.  The D.C. Circuit also recently rejected the contention that the absolute head of an agency must invoke the deliberative process or law enforcement privileges for documents in the custody of that agency (although some sufficiently high level official in the agency must assert the privilege).  See Landry v. FDIC, 204 F.3d 1125, 1135-36 (D.C. Cir. 2000).  All of these cases suggest that the question whether the President must personally invoke the privilege in civil discovery remains an open one in this Circuit.

subsidiaries, leading to a civil enforcement action that was dismissed with prejudice when the

FTC refused to comply with a court order compelling the production of certain documents it had

generated in its investigation.  See 462 U.S. at 19-20.  Grolier then sought access to these

documents through FOIA.  The FTC refused to turn over the documents, insisting that they were

attorney work product and therefore protected from disclosure under Exemption 5.  See id. at 20-

22.  Grolier filed suit challenging this refusal, arguing -- among other things -- that "the requested

documents must be disclosed because the same documents were ordered disclosed during

discovery in previous litigation."  Id. at 28.

The Supreme Court rejected this argument, holding that "[i]t does not follow . . . from an

ordered disclosure based on a showing of need that such documents are routinely available to

litigants."  Id.  The Court explained that "[t]he logical result of respondent's position is that

whenever work-product documents would be discoverable in any particular litigation, they must

be disclosed to anyone under the FOIA.  We have previously rejected that line of analysis."  Id.

(citing NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975)).  The Court therefore found

the documents exempt from disclosure under FOIA even though the same exact documents had

earlier been ordered disclosed in civil litigation.  "It is not difficult to imagine litigation in which

one party's need for otherwise privileged documents would be sufficient to override the privilege

but that does not remove the documents from the category of the normally privileged."  Id.

Therefore, any requirement that the President personally invoke the presidential

communications privilege in civil discovery does not automatically carry over into the

Exemption 5 analysis.  "At best, the discovery rules can only be applied under Exemption 5 by

way of rough analogies."  Mink, 410 U.S. at 83.  Applying this principle, courts have held that

the need of a plaintiff for a privileged document is irrelevant to the Exemption 5 inquiry (although highly relevant to the analysis of most privileges in civil discovery)[11]. See Martin v. Office of Special Counsel, 819 F.2d 1181, 1184 (D.C. Cir. 1987) ("The Supreme Court, seeing the need for a broadly sweeping rule on the matter, has insisted that the needs of a particular plaintiff are not relevant to the exemption's applicability.").[12] They have also held that other rules in civil discovery -- such as the rule that work-product documents must be disclosed when "necessary to protect the adversary system," and that a court should undertake an in camera review of a document before granting a claim of executive privilege -- fall away in the Exemption 5 inquiry as well. Mink, 410 U.S. at 88-89; Rockwell Int'l Corp. v. Dep't of Justice, 235 F.3d 598, 606 (D.C. Cir. 2001).

For several reasons, this Court concludes that the personal invocation of the presidential communications privilege is also a civil discovery rule that should not be imported into the FOIA analysis. First, the central question is always whether the records at issue are pardon documents that "fall within the ambit" of the presidential communications privilege (such that they would not be "routinely or normally" available in civil discovery). Klamath, 532 U.S. at 7-8; Judicial Watch, 365 F.3d at 1114. There is no indication that this language turns not only on the *content or nature* of a document generally, but also on the *manner* in which the exemption is raised in a particular request. For the deliberative process privilege, the D.C. Circuit has emphasized that

---

[11]   This includes the presidential communications and deliberative process privileges. See In re Sealed Case, 121 F.3d at 737-38.

[12]   See also Mink, 410 U.S. at 83 (FOIA does not "permit inquiry into particularized needs of the individual seeking the information, although such an inquiry would ordinarily be made of a private litigant"); In re Sealed Case, 121 F.3d at 737 ("[T]he particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure.").

the application of Exemption 5 "depends on the factual content and purpose of the requested

document."  See Dow Jones & Co., Inc. v. Dep't of Justice, 917 F.2d 571, 575 (D.C. Cir. 1990).[13]

The Supreme Court has applied a similar rule to other FOIA statutory exemptions.  See United

States Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 771 (1989)

(Exemption 7(C) must "turn on the nature of the requested document and its relationship to the

basic purpose of the Freedom of Information Act.").  The Court finds no reason why a different

rule should apply to the Exemption 5 presidential communications privilege.

The closest the law has come to looking beyond the nature of the document under

Exemption 5 is a single case where the Supreme Court required disclosure of a pre-sentence

report to some individuals (the subject of the report, who would be able to obtain the document

in civil discovery) but not others.  See United States Dep't of Justice v. Julian, 486 U.S. 1, 12

(1988).  The Court later cabined this approach, describing it as an exception to the general

principle that "the identity of the requesting party has no bearing on the merits of his or her FOIA

request."  Reporters Comm., 489 U.S. at 771 ("Congress clearly intended the FOIA to give any

member of the public as much right to disclosure as one with a special interest in a particular

document." (quotations omitted)); see also United Tech. Corp. v. Fed. Aviation Admin., 102 F.3d

688, 691 (2d Cir. 1996) (holding that Julian is a "narrow exception to the general rule that all

individuals should have equal rights of access under FOIA").

The reluctance to have the Exemption 5 inquiry depend even on the identity of the

individual requesting the document is in keeping with the principle that Exemption 5 should be

---

[13]  As indicated earlier, there is a similar invocation rule in civil discovery for the
deliberative process privilege as for the presidential communications privilege.  See supra note at
10.

15

interpreted in a manner that produces categorical and easily applied rules.  See, e.g., Grolier, 462 U.S. at 28 ("Only by construing the Exemption to provide a categorical rule can the Act's purpose of expediting disclosure by means of workable rules be furthered."); Critical Mass Energy Project v. Nuclear Reg. Comm'n, 975 F.2d 871, 878 (D.C. Cir. 1992) ("The Supreme Court has encouraged the development of categorical rules whenever a particular set of facts will lead to a generally predictable application of FOIA.").  An exemption analysis that yields a different outcome depending on the way in which a particular document is invoked draws FOIA away from the desired categorical approach.

There is also a critical difference between the government's invocation of a privilege in civil discovery and its decision to withhold documents under FOIA.  The former is an act of resistance to the disclosure of information in a judicial proceeding.  See United States v. Reynolds, 345 U.S. 1, 6-8 (1953); In re Sealed Case, 121 F.3d at 736.  With regard to the executive privileges in particular,[14] "coequal branches of the Government are set on a collision course.  The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives."  Cheney v. United States Dist. Ct. for the Dist. of Columbia, 124 S. Ct. 2576, 2589 (2004).  The latter is a decision to withhold a document from disclosure under a statute through which the government has chosen to make government records available to the public outside of discovery (subject to certain exceptions). An agency does not invoke a privilege against discovery when it withholds a document under one

_____

[14]   These include not only the presidential communications and deliberative process privileges at issue in this case, but the state secrets privilege, the informant privilege, and others the executive has "felt w[ere] crucial to fulfillment of the unique role and responsibilities of the executive branch of our government."  In re Sealed Case, 121 F.3d at 736.

of the exemptions, because there is no discovery to resist.  Instead, the agency simply makes the determination that a statutory provision protects the documents from disclosure, and withholds the documents on that ground.

There is no indication in the text of the statute or elsewhere that Congress anticipated -- much less demanded -- that the decision to withhold documents under Exemption 5 would need to be made personally by the head of the agency (in this case the President).  This is not the case for any other FOIA exemption decision.  The practice for decades has been otherwise.  For example, although the deliberative process privilege requires invocation by a high-level agency official in civil discovery, see Landry, 204 F.3d at 1135-36, no court has ever indicated that such an official must make the determination that a document comes within Exemption 5, and the case law[15] and the declarations in this case[16] confirm that courts routinely accept a declaration from an employee at the agency other than a high-level official as documentation of an Exemption 5 deliberative process claim.  Assistant Attorney General Keisler also attests that the language used

_____

[15]  See, e.g., Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat'l R.R. Passenger Corp., 376 F.3d 1270, 1280 (11th Cir. 2004) (senior auditor in the Office of Inspector General within the National Railroad Passenger Corporation); Church of Scientology Int'l v. United States Dep't of Justice, 30 F.3d 224, 227 n.3, 236 (1st Cir. 1994) (attorney advisor in the Executive Office for United States Attorneys); Norwood v. Fed. Aviation Admin., 993 F.2d 570, 572 (6th Cir. 1993) (assistant general counsel for litigation at the Department of Transportation); Edmonds v. FBI, 272 F. Supp. 2d 35, 43 (D.D.C. 2003) (section chief of the Record/Information Dissemination Section, Records Management Division at FBI Headquarters).

[16]  Defendant submitted declarations indicating that it is common practice for the Attorney General, the Deputy Attorney General, the head of the Drug Enforcement Agency, and other similar officials to invoke the deliberative process privilege in civil discovery, while even in FOIA cases involving documents from the highest levels of the Department of Justice, the government will often file a declaration from the Deputy Director of the Office of Information and Privacy.  See Keisler Decl. ¶¶ 6-8; Decl. of Melanie Ann Putsay, Jan. 12, 2005, ¶¶ 2-5 & Att. A-E.

by the government to invoke the deliberative process privilege in civil discovery is "consistently different" than the language used to withhold a document under Exemption 5 in FOIA.  Keisler Decl. ¶ 6.  There is simply no basis in law or practice for believing that the personal invocation of a privilege is a prerequisite to withholding under FOIA.

It is worth considering in this regard that instead of the language in Exemption 5, Congress could easily have provided an exemption for any documents that "were solicited and received by the President or his immediate White House advisers" and that relate to an issue of presidential deliberation.  Judicial Watch, 365 F.3d at 1112; In re Sealed Case, 121 F.3d at 746-47.  That would be a fair description of the presidential communication privilege, and yet there would be little reason to believe that it  would need to be invoked personally by the President.  The Court does not believe that Congress intended to graft silently onto FOIA a different rule when it wrote Exemption 5 in a manner that would encompass all privileges by allowing the government to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).

Finally, requiring the President of the United States to personally examine the documents at issue and then invoke the presidential communications privilege every time a citizen seeks presidential records through FOIA would expose the President to a considerable burden.  Unlike civil discovery, where a plaintiff must state a viable legal claim before obtaining discovery, and even then a court must screen a request for presidential documents to ensure that the discovery is essential to the proceedings, see Cheney, 124 S. Ct. at 2576, any person may seek presidential documents through FOIA, see Mink, 410 U.S. at 92.  Plaintiff's reading of Exemption 5 would

18

allow any requestor -- merely by filing a FOIA request with the Department of Justice -- to

encumber the President of the United States with the obligation to personally review perhaps

thousands of presidential documents for privilege, and then personally invoke the privilege.

Because it is the incumbent President who presumably would be responsible for invoking

Exemption 5, the burden could encompass documents from all past administrations, with which

the President would have no familiarity.[17]

The Court is unconvinced that Congress desired such a result.  In fact, the legislative

history of FOIA shows (and the Supreme Court has held) that Congress specifically intended the

President of the United States and his immediate staff to be immune from FOIA requests.  See

Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 156 (1980) (holding that

the "legislative history is unambiguous" that the Office of the President is not an agency subject

to FOIA, and therefore records of the Assistant to the President were not "agency records" and

need not be disclosed); H.R. Conf. Rep. No. 93-1380, at 15 (1974) (explaining that FOIA "is not

to be interpreted as including the President's immediate personal staff or units in the Executive

Office whose sole function is to advise and assist the President"), reprinted in 1974 U.S.C.C.A.N.

6285; see also Judicial Watch v. United States Dep't of Energy, 310 F. Supp. 2d 271, 298

---

[17] The potential burdens of plaintiffs' theory are hardly confined to the presidential communications privilege.  Other executive privileges require personal invocation by a senior agency official (and possibly the absolute head of the agency) as well.  See Landry, 204 F.3d at 1134 (allowing the head of the appropriate regional division of the FDIC to invoke the deliberative process privilege on behalf of the FDIC, but declining to reach the issue whether the head of the agency must invoke "the more sensitive and absolute privilege for state and military secrets"); Cobell v. Norton, 213 F.R.D. 1, 7 (D.D.C. 2003) (holding that the "head of the bureau or office within the Interior Department that possesses control over the requested information" must invoke the deliberative process privilege).  Requiring personal invocation under Exemption 5 would shift a substantial portion of FOIA responsibilities onto the shoulders of senior agency officials.

(D.D.C. 2004) ("The Vice President and the Office of the Vice President are not 'agencies' for purposes of the FOIA.").

Even without comparable evidence of legislative intent, the Supreme Court in <u>EPA v. Mink</u> rejected a reading of FOIA that would place an analogous burden on the judiciary and the executive.  The D.C. Circuit had ordered the district court to review <u>in camera</u> the documents the government claimed were exempt from FOIA because they contained information protected by the state secrets privilege.  The Supreme Court acknowledged that this is the practice in civil discovery, but is not necessary under FOIA:

> The Freedom of Information Act may be invoked by any member of 'the public'--without a showing of need--to compel disclosure of confidential Government documents.  The unmistakable implication of the decision below is that any member of the public invoking the Act may require that otherwise confidential documents be brought forward and placed before the District Court for in camera inspection--no matter how little, if any, purely factual material may actually be contained therein.  Exemption 5 mandates no such result.

<u>Mink</u>, 410 U.S. at 92.

The hardship imposed by personal invocation in this case is even greater than that envisioned in <u>Mink</u>, and not only because the burden fall squarely on the shoulders of the President of the United States.  The executive privileges not only require a high ranking official to invoke the privilege personally, but also to base that invocation on "actual personal consideration" of the documents and the privilege at issue.  <u>Landry</u>, 204 F.3d at 1135.  The Court can discern no basis for requiring the President personally to consider claims of privilege in the FOIA exemption setting for documents or even categories of documents, and the multitude of factors and difficult line-drawing that inquiry often demands.  Plaintiff's view finds no warrant in the statute, the legislative history, or legal precedent, and would chain the President to a stack of

documents for review at the whim of a FOIA requestor.  The Court therefore concludes that the President need not personally invoke the presidential communications privilege for the government to withhold documents that fall within the ambit of the privilege under Exemption 5 of FOIA.

## B.      Erosion of Privileges Over Time

Plaintiff also argues that neither the presidential communications nor the deliberative process privilege can be raised for the Reagan Administration records in this case because the privileges have eroded over time, to the point that they no longer protect the documents from disclosure.  The D.C. Circuit in <u>Judicial Watch</u> acknowledged that the "expectation of the confidentiality of executive communications [] has always been limited and subject to erosion over time after an administration leaves office," but did not discuss the nature of the erosion (involving pardon documents from the Clinton Administration) because the issue had not been raised by the parties.  <u>Judicial Watch</u>, 365 F.3d at 1124 (quoting <u>Nixon v. Administrator of Gen. Servs.</u>, 433 U.S. 425, 451 (1977)).  This Court now takes up the issue, and concludes that the Reagan Administration documents in dispute in this case fall within the ambit of the presidential communications privilege, and therefore may be withheld under Exemption 5.[18]

As far as this court is aware, no court has ever held that documents fifteen (or twenty-three) years old cannot be protected by the presidential communications or deliberative process privileges.  Plaintiff relies on two cases for the contention that the Court should nonetheless find

---

[18]  Plaintiff states that he is making this argument as to all documents for which defendant is raising the presidential communications or the deliberative process privilege exception for a set of documents that are dated from 2000 to 2001.  All but two of these documents have already been voluntarily released.  <u>See</u> Pl. Mem. at 17 n.6; Second Am. Vaughn Index at 16.

that these documents would be routinely or normally disclosed in civil discovery upon a showing

of relevance.  The first is Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 451 (1977), in

which the Supreme Court rejected a facial challenge by former President Nixon to the

Presidential Recording and Materials Preservation Act ("PRMPA"), which permitted the

archiving and screening of Nixon administration records.  President Nixon argued that the

documents that would be disclosed under the statute are protected by the presidential

communications privilege.  The decision responded in part by noting (without explanation ) that

"[t]he expectation of the confidentiality of executive communications thus has always been

limited and subject to erosion over time after an administration leaves office." Id. at 1124.  (This

is the same language later quoted by the D.C. Circuit in Judicial Watch.)

        The second case on which plaintiff relies is Nixon v. Freeman, 670 F.2d 346 (D.C. Cir.

1982), in which the D.C. Circuit upheld -- again against a challenge by former President Nixon --

regulations under the PRMPA that allowed members of the public to listen to copies of certain

tape recordings.  The Court rejected President Nixon's argument that the regulations should be

invalidated because they encroach upon the presidential privilege in the confidentiality of

government records, noting that "it is significant that no public access will occur until at least

eight years after the event disclosed," and that the regulatory scheme contains enough restrictions

to "adequately protect the privilege of confidentiality without adoption of Mr. Nixon's

proposals," including a suggestion that the Court impose on the statute a blanket rule prohibiting

access to non-Watergate-related tapes for twenty-five years.  See id. at 356-58.

        These cases do not establish that a President would normally or routinely be unable to

invoke the presidential communications (or deliberative process) privileges in documents more

than 15 years old in civil litigation.  At the outset, neither case involved civil discovery, or even

the disposition of particular documents -- they were general attacks on statutes and regulations.

Moreover, both cases emphasized that the statutory and regulatory schemes at issue were

acceptable because they preserved for the President an opportunity to invoke his constitutional

privilege for particular classes of documents.  See Nixon, 433 U.S. at 429 ("[A]ny eventual

public access will be governed by the guidelines of § 104, which direct the Administrator to take

into account the need to protect any party's opportunity to assert any . . . constitutionally based

right or privilege."); Nixon, 670 F.2d at 352 ("No tape will be made public . . . until Mr. Nixon

and any others whose rights or privileges are implicated by disclosure have had an opportunity to

object to disclosure and obtain judicial review of any adverse determination.").

Most important, the cases refused to place a categorical time bar on the duration of the

privilege.  The D.C. Circuit stated explicitly that "there is no fixed number of years that can

measure the duration of the privilege."  Nixon, 670 F.2d at 352.  And the Supreme Court

explained that:

> The confidentiality necessary to [a president's] exchange cannot be measured by
> the few months or years between the submission of the information and the end of
> the President's tenure; the privilege is not for the benefit of the President as an
> individual, but for the benefit of the Republic.

Nixon, 433 U.S. at 448-49.  Thus, this Court can find no basis in existing precedent for the

notion that the presidential communications or deliberative process privileges are not routinely

available in civil discovery for documents more than 15 years old.  Plaintiff cannot point to a

single case where documents within the scope of these privileges have been released in civil

discovery due to their age[19]; one court has suggested that the privileges survive eight years ("the end of the President's tenure," Nixon, 433 U.S. at 449); another has suggested that the privileges will not *categorically* preclude access to all presidential documents after 25 years; and the D.C. Circuit has stated that there is "no fixed number of years" for the privileges.  This body of law is far from compelling support for the contention that the presidential communications and deliberative process privileges normally will expire in 15 years.[20]

Plaintiff also references the Presidential Records Act ("PRA"), 44 U.S.C. § 2201, which transfers responsibility for the preservation of presidential records at the completion of an administration to the Archivist of the United States, who is then responsible for preserving the records and preparing them for public access.  44 U.S.C. § 2203(f)(1).  Five years after the close of an administration, members of the public may access presidential documents subject to certain potential exceptions, including one for presidential communications.  Id. § 2204(b), (c).  Twelve years after a President leaves office, all presidential materials preserved by the Archivist become available to the public in accordance with FOIA, except that the statute specifically provides that Exemption 5 cannot be used by the Archives to withhold documents.  Id. § 2204(c)(1).[21]  Plaintiff

---

[19]  On the other hand, courts have routinely addressed the application of the executive privilege in civil discovery to documents more than a decade old without discussing the matter of their age.  See Marriott Intern. Resorts, L.P. v. United States, 63 Fed. Cl. 144, 146 (2004) (ten years old); Fitzgibbon v. U.S. Secret Service, 747 F. Supp. 51, 57 (D.D.C. 1990) (twenty years old)

[20]  Courts have rejected similar time limits for other FOIA exemptions.  See, e.g., Fitzgibbon v. United States Secret Serv., 747 F. Supp. 51, 55 (D.D.C. 1990) (rejecting contention that "because the documents at issue are more than twenty years old, this information could not possibly involve legitimate national security interests" for purposes of Exemption (B)(1)).

[21]  "Subject to the limitations on access imposed pursuant to subsections (a) and (b), Presidential records shall be administered in accordance with section 552 of title 5, United States

thus contends that the PRA reflects a congressional intent to confine the presidential

communications privilege under Exemption 5 to twelve years.

The difficulty with plaintiff's position is that the PRA states expressly that "[n]othing in

this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege

which may be available to an incumbent or former President." Id. § 2204(c)(2); see also H.R.

Rep. 95-1487, at 14 (1978) (PRA is not to be construed as a "reflection of the Congress' views on

the extent to which a former President may assert a constitutionally based privilege"). Plaintiff

acknowledges as much, but nonetheless suggests that the time limitation in section 2204(c)(1)

can be impliedly read into Exemption 5 of FOIA. But if there were truly a blanket 12-year bar on

the assertion of Exemption 5, then the language in section 2204(c)(1) precluding the use of

Exemption 5 after 12 years specifically for Archivist documents would have been entirely

unnecessary. See Center for Law and Educ. v. Dep't of Educ., 315 F. Supp. 2d 15, 32 (D.D.C.

2004) ("Plaintiffs' proposed interpretation would render the first sentence of [the statute]

redundant and is therefore disfavored."), aff'd, 396 F.3d 1152 (D.C. Cir. 2005). Plaintiff is free

to seek presidential pardon documents from the Archivist or the Reagan Library through section

2204(c)(1), and the Court certainly does not reach the question of the proper resolution of a case

where these entities decline to disclose a document on the basis of the presidential

communications privilege. The Court simply holds that none of this bears on whether these

documents would normally be obtainable in civil discovery for purposes of the Exemption 5

---

Code, except that paragraph (b)(5) of that section shall not be available for purposes of
withholding any Presidential record, and for the purposes of such section such records shall be
deemed to be records of the National Archives and Records Administration." Id. § 2204(c)(1).

inquiry.[22]

The presidential communications and deliberative process privileges are qualified privileges, assessed through a balancing of several factors.  See In re Sealed Case, 121 F.3d at 753.  The age of the document is only one of those factors.  For the presidential communications privilege, a court must also assess the "public interests at stake in determining whether the privilege should yield in a particular case," and "must specifically consider the need of the party seeking privileged evidence."  Id. at 745.  The deliberative process privilege is all the "more ad hoc," and "includes consideration of additional factors such as whether the government is a party to the litigation," "the relevance of the evidence," "the availability of other evidence," "the seriousness of the litigation," "the role of the government" in the litigation, and the "possibility of future timidity by government employees."  Id. at 737.  Therefore, even if there were support for the argument that the executive privilege for a document significantly erodes after 15 years, that would not end the Exemption 5 inquiry.  Plaintiff would still need to demonstrate that the privilege erodes to such a degree that -- even after one sets the age of the document alongside all of the other factors that bear on the assessment of the privilege -- the documents would still "normally" or "routinely" be disclosed.

The Court does not believe plaintiff can show this.  The moment a President invokes a

---

[22]  Plaintiff also notes that most former Presidents -- including President Reagan -- have released the vast majority of their documents soon after the end of their tenures.  The fact that former Presidents have chosen to release most of their documents says little about whether they are able to protect the documents they choose not to disclose through a presidential privilege.  Plaintiff presents impressive evidence of a strong tradition of prompt disclosure of presidential documents in this country.  However, as with the rest of his arguments, that does not approach a showing that a President would "normally or routinely" be unable to invoke a privilege for 15-year old documents in civil litigation.

privilege, the communication at issue "becomes presumptively privileged."  In re Sealed Case, 121 F.3d at 744-45.  The Supreme Court recently reaffirmed that a plaintiff must meet a demanding burden to overcome the executive's invocation of a presidential communications privilege.  See Cheney, 124 S. Ct. at 2589.  While this Court does not doubt that there will be many instances where communications among presidential staff (or other executive officials) would be admissible in litigation when they are more than 15 years old, the Court is unconvinced that the showing would be so routine that a blanket 15-year statute of limitations on the presidential communications and deliberative process privileges should be recognized under Exemption 5.  See Grolier, 462 U.S. at 28 ("It is not difficult to imagine litigation in which one party's need for otherwise privileged documents would be sufficient to override the privilege but that does not remove the documents from the category of the normally privileged.").  The Court therefore concludes here that no categorical time bar on the assertion of the presidential communications and deliberative process privileges under Exemption 5 of FOIA is warranted.[23]

### C.    Deliberative Process Privilege For Recommendation Letters

Plaintiff claims that the Exemption 5 deliberative process privilege should not apply to four recommendation letters solicited by the Office of the Pardon Attorney from judges and special prosecutors.  By its terms, Exemption 5 only applies to "inter-agency" and "intra-agency"

---

[23]  Plaintiff does not argue that there is anything special about the pardon documents in this case that would make these documents in particular normally discoverable after 15 years (even if others might not be).  In fact, he argues just the opposite, insisting that "clemency records are no different from other presidential records, and the advice that a president receives about clemency applications is no different from the advice that the president receives in performing his other Article II functions–advice about appointments, foreign policy, and proposing budgets, for example."  Pl. Mem. at 16.  Thus, plaintiff is left to argue that there should be a flat 15-year statute of limitations on the Exemption 5 presidential communications and deliberative process privileges, and it is that argument that the Court rejects today.

27

records.  All agree that the letters from judges and special prosecutors are not "inter-agency"

documents (because the judges and special prosecutors are not employees of an "agency").

Defendant nonetheless contends that these documents should be considered "intra-agency"

documents because the officials are serving as outside consultants for purposes of Exemption 5.[24]

Defendant argues that this case is governed by Ryan v. Dep't of Justice, 617 F.2d 781

(D.C. Cir. 1980), where the D.C. Circuit held that responses by Senators to questionnaires sent

by the Attorney General regarding their procedures for picking judicial nominees were "intra-

agency" -- when "an agency record is submitted by outside consultants as part of the deliberative

process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting

document to be an 'intra-agency- memorandum.'"  Id. at 790.  Plaintiff argues that this holding is

no longer good law in light of the decision in Dep't of Interior v. Klamath, 532 U.S. 1 (2001),

where the Supreme Court held that memoranda from Native American tribes to the Bureau of

Indian Affairs during administrative proceedings concerning the allocation of water in the region

inhabited by the tribes were not "intra-agency" records because the tribes were acting as "self-

advocates" rather than consultants.

The Supreme Court in Klamath explained that it is "textually possible" to regard as an

intra-agency record a memorandum that has been received by an agency from an outside official

to help the agency in the performance of its functions.  "Typically, courts taking [that] view have

held that the exemption extends to communications between Government agencies and outside

consultants hired by them."  Id. at 9 (citing cases involving property appraisals by outside

---

[24]  Defendant has abandoned any claim that these documents fall within the presidential
communications privilege in the wake of the D.C. Circuit decision in Judicial Watch.  Def. Mem.
at 7 & n.4.

consultants).  The Court explained that it did not "read the cases as necessarily assuming that an outside consultant must be devoid of a definite point of view when the agency contracts for its services."  Id. at 10.  However, the Court noted that

> the fact about the consultant that is constant in the typical cases is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it.  Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do.

Id. at 10-11.  The tribes in Klamath, on the other hand, were communicating with the Bureau "with their own, albeit entirely legitimate, interests in mind" -- they were "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone."  Id. at 12.

The Supreme Court addressed Ryan and other D.C. Circuit authority in a footnote.  The Court noted that it "would expect a Senator to have strong personal views on the matter" of the judicial nomination process, and yet the D.C. Circuit in Ryan had held that Senators' responses to questionnaires on the issue were exempt.  Id. at 12 n.4.  The Court also cited the D.C. Circuit decision in Public Citizen, Inc. v. Dep't of Justice, 111 F.3d 168 (D.C. Cir. 1997), where communications between Presidents and the National Archives and Records Administration were deemed intra-agency documents even though "the Presidents had their own, independent interests" in the disposition of their documents by the agency.  532 U.S. at 12 n.4.  The Court explained that these cases "arguably extend beyond what we have characterized as the typical examples," but that "[w]e need not decide whether either instance should be recognized as intra-agency, even if communications with paid consultants are ultimately so treated," because "[a]s explained above, the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants."  Id.

Withholding the documents in this case falls entirely within the rule of Ryan, and is fully

consistent with the reasoning  in Klamath.  The recommendation letters at issue here were

"submitted by outside consultants as part of the deliberative process" and were "solicited by the

agency," and therefore they qualify as intra-agency documents under Ryan.  See 617 F.2d at 790;

see also Public Citizen, 111 F.3d at 170 ("[R]ecords of communications between an agency and

outside consultants qualify as 'intra-agency' for purposes of Exemption 5 if they have been

created for the purpose of aiding the agency's deliberative process." (quotation omitted)).  Fairly

read, the holding of Klamath is only that a communication from an "*interested party*" seeking a

Government benefit "*at the expense of other applicants*" is not an intra-agency record.  Klamath,

532 U.S. at 12 n.4 (emphasis added).

That is not the situation here.  The Supreme Court in Klamath expressly declined to

overrule Ryan, and it is certainly not the province of this Court to do so.[25]  It may well be that the

D.C. Circuit will read Klamath as an instruction to narrow its view of  "intra-agency"

communications.  However, "district judges . . . are obligated to follow controlling circuit

precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule it."

United States v. Torres, 115 F.3d 1033, 1035 (D.C. Cir. 1997).  Until that time, Ryan remains

good law, and under Ryan, the recommendation letters at issue qualify as intra-agency documents

_____

[25]  Courts in this circuit have continued to treat Ryan and Public Citizen as governing law
even after Klamath.  See Physicians Comm. For Responsible Med. v. Nat'l Inst. of Health, 326 F.
Supp. 2d 19, 28-30 (D.D.C. 2004) (citing Ryan and Public Citizen to conclude that a doctor is
not acting as an intra-agency consultant on behalf of the government for purposes of Exemption
5 when he receives a government grant and conducts his research); Center for Int'l Envtl. Law,
237 F. Supp. 2d at 27-29 (relying on Ryan and Public Citizen to conclude that communications
between United States and Chile in course of treaty negotiations did not fall within consultant
exception to intra-agency rule).

and therefore were properly withheld under Exemption 5.[26]

## II.    Exemptions 6 and 7(C)

Plaintiff challenges the redaction from pardon documents of the names of three groups of

individuals:  unsuccessful pardon applicants, private citizens who wrote letters in support of

clemency applications, and several third parties who are mentioned in the FBI investigation files

of pardon applicants.  Defendant has redacted these names under either Exemption 6 or

Exemption 7(C) to protect the privacy rights of those individuals.  In most cases, defendant has

redacted these names from documents that otherwise have been released to plaintiff (although

there are some cases where the document is being withheld in full on Exemption 5 grounds and

the names are withheld in the alternative on privacy grounds under Exemptions 6 and 7(C)).

Exemption 6 allows the government to withhold "personnel and medical files and similar files

the disclosure of which would constitute a clearly unwarranted invasion of personal privacy,"

while Exemption 7(C) exempts from disclosure information compiled for law enforcement

purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of

personal privacy."  5 U.S.C. §§ 552(b)(6), (b)(7).

When assessing whether information was properly withheld on personal privacy grounds

under Exemptions 6 and 7(C), the Court must "identify[] the relevant privacy interests in

---

[26]  Even if Ryan were no longer good law, this case fits comfortably within even the most
expansive reading of Klamath.  One would not think that the judges and special prosecutors
providing their recommendations on pardon applications are "self-advocates" representing "an
interest of [their] own."  Klamath, 532 U.S. at 10-11.  Unlike the Senators in Ryan (who would
be participants in the judicial nomination process) and the Presidents in Public Citizen (who had
an interest in the disposition of their documents), the judges and special prosecutors do not have
any obvious stake in a criminal proceeding that is long since completed.  Their only obligation in
advising the executive on a pardon application would be "to truth and [a] sense of what good
judgment calls for," as required under the Klamath rule.  Id.

31

nondisclosure and the public interests in disclosure, and determin[e] whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy."  Reed v. NLRB, 927 F.2d 1249, 1251 (D.C. Cir. 1991).  "Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose."  Reporters Comm., 489 U.S. at 773.  The D.C. Circuit has emphasized that "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act."  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2003) (quotation omitted).

### A.    Unsuccessful Pardon Applicants

Plaintiff contends that defendant improperly redacted the names of 141 unsuccessful pardon applicants from records in the files of other applicants in which they happened to appear. The government bears the burden of proving that a withheld document falls within a claimed exemption, see Computer Prof'ls for Social Responsibility v. United States Secret Serv., 72 F.3d 897, 902 (D.C. Cir. 1996), but here the only real privacy interest defendant can identify is one arising out of its own regulations, which provide that "[p]etitions, reports, memoranda, and communications submitted or furnished in connection with the consideration of a petition for executive clemency generally shall be available only to the officials concerned with the consideration of the petition."  28 C.F.R. § 1.5.  Defendant maintains that this regulation gives a pardon applicant a reasonable expectation of privacy in his application for a pardon.  Def. Mem. at 27.

A pardon applicant could hardly read this regulation as a firm promise of anonymity, since the regulation only states a general principle and goes on to emphasize that these materials "may be made available for inspection, in whole or in part, when in the judgment of the Attorney

General their disclosure is required by law or the ends of justice."  28 C.F.R. § 1.5.  More to the

point, the regulation suggests a distinction between the documents an applicant files in support of

his applications for a pardon ("petitions, reports, memoranda, and communications"), and the

application itself (a "petition for executive clemency").  The pardon application materials can be

expected to contain highly personal information about an applicant that implicates privacy

concerns.  It is far more difficult to understand, and defendant does not explain, how the mere

fact that an individual has sought a pardon reveals "sensitive personal information" about the

individual amounting to a "clearly unwarranted invasion of personal privacy."  Judicial Watch,

365 F.3d at 1126; Reed, 927 F.2d at 1251.

     In Judicial Watch, the plaintiffs had sought the actual pardon applications considered by

President Clinton, and the government withheld this information under Exemption 6 for reasons

of personal privacy.  The D.C. Circuit concluded that the applications fell within Exemption 6,

citing the fact that they contain "non-public personal information about the applicants and their

lives before and after their convictions and personal information about third parties," and that the

"application calls for a broad range of detailed and highly personal information about a pardon

applicant."  365 F.3d at 1124.  At no point, however, did the court even suggest that disclosure of

the *fact* that an individual filed a petition for a pardon, instead of the *contents* of the petition

itself, amounts to an unwarranted invasion of the privacy of the applicant.

     The First Circuit considered these questions in a somewhat different context in Kurzon v.

Dep't of Health & Human Servs., 649 F.2d 65 (1st Cir. 1981).  The plaintiff in that case brought

an action under FOIA to compel the agency to disclose the names and addresses of unsuccessful

applicants for research grants from the National Cancer Institute.  The government withheld the

documents on personal privacy grounds under Exemption 6, arguing that the release of information that a scientist was denied a research grant would do damage to the scientist's professional reputation, and citing a policy statement in the Federal Register stating that a "research training grant application on which award is not made" is "generally not available" to the public -- language strikingly similar to the regulation in this case.  Id. at 69.

The court nonetheless concluded that it was "not persuaded that the nature of the privacy interest threatened, taken in conjunction with the protection of exemption 6, warrants the protection of exemption 6."  Id.  The Court emphasized that rejection "is not so rare an occurrence as to stigmatize the unfunded applicant," and that although the "protection of professional reputation, even in this strict sense, is not beyond the purview of exemption 6, it is not at its core."  Id.  The Court also held that the language in the Federal Register could not be read to make a specific promise of confidentiality.  Id. at 69-70.  Much of the reasoning in Kurzon was devoted to whether the name of an unsuccessful applicant is a "similar file" within the meaning of Exemption 6 (which applies to "personnel and medical files and similar files").  The test the decision employed, although the  prevailing rule at the time, was later rejected by the Supreme Court.[27]  However, the specific analysis of the privacy issues raised by a denial of a grant application remains instructive.  In fact, when the plaintiff in Kurzon more recently again sought the names and addresses of unsuccessful grant applicants, and the government again refused, the district court relied on Kurzon to conclude that unsuccessful applicants have something "less than a significant interest" in the anonymity of their identities, and therefore

---

[27]   See Washington Post, 456 U.S. at 598 (rejecting Board of Trade v. Commodity Futures Trading Comm'n, 627 F.2d 392, 398 (D.C. Cir. 1980)).

forced the government to disclose the information once more.  See Kurzon v. Dep't of Health and

Human Servs., 2001 WL 821531, at *7 (D.N.H. 2001).

Here, there is not even the modest concern for professional embarrassment that was

present in Kurzon.  The applicant is petitioning the government for the performance of a public

act; this is not a situation where he is a third-party who finds himself in government records

through no action of his own.[28]  The conviction that the pardon applicant is seeking to annul was

itself public, and it cannot be thought that the information that the individual later was denied a

pardon application adds much additional embarrassment beyond the original conviction.[29]

Finally, the identities of the *successful* pardon applicants are disclosed to the public.  Defendant

simply is unable to explain what it is about the names of the *unsuccessful* applicants that

---

[28]  See In re F & H Barge Corp., 46 F. Supp. 2d 453, 456 (E.D. Va. 1998) ("[B]ecause
plaintiff has launched a lawsuit that, among other things, seeks damages arising out of his status
as a merchant marine, he himself has invited scrutiny of his claim in general."); Alliance for the
Wild Rockies v. Dep't of the Interior, 53 F. Supp. 2d 32, 37 (D.D.C. 1999) (requiring disclosure
of identity of "individuals who respond[ed] to a DOI solicitation for comments on an agency
proposal," in part because the comments "were submitted voluntarily" and therefore the
individuals do not have an expectation of privacy).

[29]  This case is therefore far different than the situation of a job applicant who might be
injured in his employment prospects by disclosure that he applied for, but was denied, a job
opportunity.  See Prof'l Programs Group v. Dep't of Commerce, 29 F.3d 1349, 1355 (9th Cir.
1994) (denying company's FOIA request for "potentially embarrassing personal information
regarding the test performance of the patent bar applicants"); Core v. United States Postal
Service, 730 F.2d 946, 949 (4th Cir.1984) (denying FOIA request for employment histories of
unsuccessful applicants for federal employment because "disclosure may embarrass or harm
applicants who failed to get a job").

As in Kurzon, denial of a pardon application "is not so rare an occurrence as to stigmatize
the [unsuccessful] applicant."  Kurzon, 649 F.2d at 69; see Presidential Clemency Actions by
Administration: 1945-2001, available at http://www.usdoj.gov/pardon/actions
_administration.htm (showing that the Reagan administration granted roughly ten percent of all
pardon and commutation requests)

uniquely implicates personal information sensitive enough to bring the records within Exemption 6.[30]

Turning to the public interest in disclosure, the Court finds that release of the identity of unsuccessful pardon applicants would "shed[] light" on the exercise of the pardon power in important ways.  Reporters Comm., 489 U.S. at 773.  A comparison of successful and unsuccessful applicants would illuminate -- indeed, a claim could be made that it is essential to an understanding of -- the circumstances in which the executive chooses to grant or deny a pardon and the factors that bear on that decision.  This is all the more true in view of the fact that the names of the applicants in this case actually appear in the files of other pardon applicants (suggesting that the Office of the Pardon Attorney itself recognized a relationship between the two applications).  This is a paradigmatic case for disclosure, in that the information would serve directly to open the Government's activities "to the sharp eye of public scrutiny."  Reporters Comm., 489 U.S. at 773.

The names of unsuccessful pardon applicants are therefore far closer to information that "sheds light on an agency's performance of its statutory duties" than to "information about private citizens that is accumulated in various governmental files but reveals little or nothing about an agency's own conduct."  Id. at 763.  The Court is not concerned here with the identity of

---

[30]  Defendant suggests in its reply papers that disclosure of the identity of an unsuccessful pardon applicant serves as a reminder in cases of minor or dated convictions that the individual was convicted in the first place.  Def. Rep. at 12 n.4.  It relies here on Reporters Comm., 489 U.S. at 771, which concluded that a criminal "rap sheet" is protected from disclosure under Exemption 6 even though much of the information is available elsewhere because it reflects the "compilation of otherwise hard-to-obtain information."  Id. at 771.  It would stretch Reporters Comm. well past recognition to apply it to a case where information is sought that does not compile sensitive information, but might only remind one of public but sensitive information.  Of course, defendant's reasoning would apply with equal force to successful pardons as well.

pending pardon applicants (the documents at issue are all from the Reagan administration or

earlier), and hence with any impact of disclosure on ongoing presidential consideration.  The

Court also does not have occasion to address whether the identity of a pardon applicant could, in

certain circumstances, be exempt under some other FOIA exemption.  The only exemption

claimed in this case to prevent disclosure of the names of unsuccessful applicants -- Exemption 6

-- does not justify withholding.  Accordingly, the Court will order defendant to disclose the

names of unsuccessful pardon applicants identified in the requested pardon files.[31]

### B.    Individuals Supporting Clemency Applications

Plaintiff also challenges the redaction from several pardon records of the names of private

citizens who wrote letters in support of a pardon application or who were listed as character

references on pardon applications.  To justify the redaction, defendant insists that a private

citizen has a "cognizable privacy interest in . . . the fact that he supported or opposed a particular

clemency request, especially where the case generated a considerable amount of controversy at

the time the petition was granted or denied and the writer may now be reluctant to have his stance

on the matter publicly disclosed."  Morison Decl. ¶ 36.  This view is not supported by the law.

When a citizen petitions his government to take some action, courts have generally

declined to find the identity of the citizen to be information that raises privacy concerns under

Exemption 6.  See, e.g., Landmark Legal Servs. v. Internal Revenue Service, 87 F. Supp. 2d 21,

27 (D.D.C. 2000) (finding no privacy interest under Exemption 6 in the identity of individuals

who wrote letters to the IRS regarding an investigation of tax-exempt organizations); Alliance for

---

[31]  Defendant is not required to disclose these names when they are contained in a
document or a portion of a document that is otherwise withheld under Exemption 5 (or on the
basis of some other exemption, not challenged by plaintiff in this suit).

the Wild Rockies v. Dep't of the Interior, 53 F. Supp. 2d 32, 34 (D.D.C. 1992) (holding that

government must disclose under Exemption 6 the identities of individuals who voluntarily

submitted comments in response to an agency's solicitation of comments in a notice of proposed

rulemaking); Holland v. Cent. Intelligence Agency, 1992 WL 233820, at *15 (D.D.C.) (requiring

disclosure under Exemption 6 of identity of an individual who wrote letter to CIA requesting

assistance with obtaining access to documents).

Thus, the prevailing rule is that a citizen does not normally have a significant privacy

interest in a viewpoint that he volunteers to the government to support legal change.  See James

T. O'Reilly, Federal Information Disclosure § 16:43 (3d ed. 2005) ("Comment letters written to

agencies are public unless the agency can show harassment or reprisal would result from the

disclosure.  Where no showing is made that laws do not offer sufficient protection against such

reprisals, the letters should be available and are not exempt since (b)(6) does not offer blanket

anonymity.").[32]  Balanced against this modest privacy interest is the considerable public interest

in identifying the actors who are able to exert influence on the pardon application and selection

process.  See, e.g., Judicial Watch v. United States Dep't of Justice, 102 F. Supp. 2d 6, 18

(D.D.C. 2000) ("Depriving the public of knowledge of the writer's identity would deprive the

public of a fact which could suggest that their Justice Department had been steered by political

pressure rather than by the relevant facts and law."); Alliance for the Wild Rockies, 53 F. Supp.

---

[32]  Disclosing the identity of a private citizen who has supported a pardon application
could conceivably reveal the supporter's friendship or affiliation with the applicant, and in certain
instances that relationship could give rise to a modest privacy concern, particularly if the
applicant is unpopular.  However, that concern is diluted significantly in this case by two
variables:  (i) here, the private citizen has volunteered this affiliation to the government, and (ii)
even the government does not identify this as a concern with regard to the letters in this case.

2d at 36 ("In this instance, the public has much to learn about defendants' rulemaking process from the disclosure of commenters' names and addresses.").[33]

There is, to be sure, a countervailing interest in private citizens feeling free to provide their views on pardon applications in full candor, and this interest may well be promoted through secrecy.  But in this FOIA action, the issue for the Court is whether disclosure would promote the purpose of FOIA in "open[ing] agency action to the light of public scrutiny," not whether that purpose is desirable as a matter of public policy in any particular case.  The concern that disclosure might undermine the pardon selection process may be a reason to enlarge the deliberative process privilege to include certain deliberations between the government and a private party.  But it is not a reason to expand Exemption 6 to situations where there is not a sufficient privacy interest at stake.  Therefore, the Court will require defendant to reveal the names of individuals mentioned in the pardon documents that were withheld on privacy grounds because they wrote letters in support of a clemency application or who were listed as character references on pardon applications.[34]

_____

[33] The court in Judicial Watch of Florida indicated that "[a] person who has written a letter to a federal official may have a great privacy interest in the nondisclosure of his name. On the other hand, the court can imagine scenarios in which disclosing the identity of those who wrote letters to the AG regarding campaign finance issues or Independent Counsel Act matters might not 'constitute a clearly unwarranted invasion of personal privacy' within the meaning of FOIA Exemption Six."  102 F. Supp. 2d at 17.  This Court does not doubt that there will be some instances where disclosure of the identity of the author of a letter might raise privacy concerns, particularly if there is sensitive personal information in the letter.  There are also many situations in which it might very well be in the public interest for the author of a communication to the government to remain secret (for example, in a case involving whistleblowers).  However, none of these cases involve the situation here:  a private citizen writing a letter to the government that expresses the private citizen's views on an issue of governance.

[34] Once again, defendant is not required to disclose these names when they are contained in a document or a portion of a document that is properly withheld under Exemption 5 (or on the

### C.      Third-Parties Identified in FBI Investigative Files

Finally, plaintiff seeks the names of third parties redacted under Exemption 7(C) from

FBI investigative files created during the background investigations of pardoned individuals.

Specifically, plaintiff seeks the name "of a witness at a public trial, the name of someone

sentenced in open court on a conspiracy conviction (apparently a co-conspirator of Frank

Sturgis), the name of a co-defendant of John Ehrlichman, and the name of John Ehrlichman's

lawyer."  Pl. Rep. at 12-13.  Although the identity of some of these individuals may be publically

known, their presence in an FBI investigatory file is not.  The FBI explains that it withheld these

names because the disclosure of third-party names in an FBI investigation file "could cause

unsolicited and unnecessary attention to be focused on them," and "may cast them in an

unfavorable or negative light to the public."  Keeley Decl. ¶ 15.  Plaintiff does not provide any

reason to question this concern for the privacy interests of third parties who appear in

government investigatory files, or any compelling argument for how the release of the identities

of third-parties appearing in these files would shed any light on the operation of the pardon

application process.  See Safecard Servs., Inc. v. Sec. & Exch. Comm'n, 926 F.2d 1197, 1206

(D.C. Cir. 1991) ("[W]e now hold categorically that, unless access to the names and addresses of

private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to

confirm or refute compelling evidence that the agency is engaged in illegal activity, such

information is exempt from public disclosure.").[35]  Accordingly, plaintiff's request for the names

—————————————————

basis of some other exemption, not challenged by plaintiff in this suit).

     [35]   See also Neely v. Fed. Bureau of Investigation, 208 F.3d 461, 464 (4th Cir. 2000)
(holding that "government employees, third-party suspects, and other third parties mentioned or

of these third-party individuals in government investigatory files is denied.

## III.   <u>Vaughn</u> Index

Lastly, plaintiff argues that the <u>Vaughn</u> index should include the names of the clemency applicant who is the subject of each withheld letter of advice.  The purpose of a <u>Vaughn</u> index is "to permit adequate adversary testing of the agency's claimed right to an exemption, and enable the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves."  <u>King v. United States Dep't of Justice</u>, 830 F.2d 210, 218 (D.C. Cir. 1987).  The index should provide "as much information as possible without thwarting the [claimed] exemption's purpose."  <u>Id.</u> at 224-25.  However, "the government is not expected to provide so much detail in its supporting materials that it risks compromising the very interests it is seeking to protect."  <u>Church of Scientology Int'l v. United States Dep't of Justice</u>, 30 F.3d 224, 234 (1st Cir. 1994).

Plaintiff does not explain how the names of the clemency applicants would shed any light on whether the letters of advice were properly withheld under FOIA.  <u>See</u> <u>In re Dep't of Justice</u>, 999 F.2d 1302, 1309 (8th Cir. 1993) (government need not "produce a fact-specific, document-specific <u>Vaughn</u> index" where the "contents of the requested documents are irrelevant").  Indeed, this Court has concluded that the letters of advice were properly withheld without finding any need to examine the names of the individual clemency applicants at issue in the letters.  <u>See</u> <u>Dep't of Justice v. Maydak</u>, 218 F.3d 760, 764 (D.C. Cir. 2000) (agency need only support the

---

interviewed in the course of the investigation have well-recognized and substantial privacy interests in the . . . nondisclosure of their identities and their connection with particular investigations because of the potential for future harassment, annoyance, or embarrassment" and that the public interest in access to this information is usually "negligible").

exemptions it seeks "in such a manner that the district court can rule on the issue").  Therefore,

no further amendment of the <u>Vaughn</u> index is necessary, and plaintiffs' request for an amended

<u>Vaughn</u> index is denied.

## **<u>CONCLUSION</u>**

For the reasons explained in this opinion, the Court grants in part and denies in part

plaintiff's motion for summary judgment or, in the alternative, for a more adequate <u>Vaughn</u>

index, and grants in part and denies in part defendant's motion for summary judgment.

Defendant will be ordered to disclose to plaintiff the names of unsuccessful pardon applicants,

and individuals who wrote letters in support of pardon applications or were listed as character

references on pardon applications, to the extent those names appear in pardon documents or

portions of pardon documents requested by plaintiff that defendant has not withheld on some

other basis under FOIA.


                                                  <u>      /s/ John D. Bates          </u>
                                                      JOHN D. BATES
                                       United States District Judge


Dated:<u>   March 31, 2005   </u>

Copies to:

Michael Edward Tankersley
Public Citizen Litigation Group
1600 20th Street, Northwest
Washington, D.C.  20009
202-588-1000 (telephone)
202-588-7795 (fax)
E-mail:  tankers@citizen.org

Alison Marcy Zieve
Public Citizen Litigation Group
1600 20th Street, Northwest
Washington, D.C.  20009
202-588-1000 (telephone)
202-588-7795 (fax)
E-mail:  azieve@citizen.org

John Russell Tyler
United States Department of Justice
20 Massachusetts Avenue, Northwest
Washington, D.C.  20530
202-514-2356 (telephone)
202-616-8470 (fax)
E-mail:  john.tyler@usdoj.gov